# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

YUSUF AHMED, MARY ANN STOCUM, ANDREW LORING, MARK SEVERN, EDWARD LIEF, AND SCOTT DIEHL individually and as representatives of a class of participants and beneficiaries on behalf of the Liberty Mutual 401(k) Plan,

     *Plaintiffs*,

v.

LIBERTY MUTUAL GROUP, INC., THE 401(K) PLAN ADMINISTRATIVE COMMITTEE, DAVID H. LONG, JAMES KELLEHER, MARK C. TOUHEY, NEETI BHALLA, DENNIS J. LANGWELL, MELANIE M. FOLEY, CHRISTOPHER PEIRCE, AND JOHN DOES 1–40,

     *Defendants.*

No. _____

CLASS ACTION

## COMPLAINT

1. Plaintiffs Yusuf Ahmed, Mary Ann Stocum, Andrew Loring, Mark Severn, Edward Lief and Scott Diehl individually and as representatives of a class of participants and beneficiaries of the Liberty Mutual 401(k) Plan (the "Plan"), f/k/a the Liberty Mutual Employees Thrift-Incentive Plan, bring this action under 29 U.S.C. §1132(a)(2) on behalf of the Plan against Defendants Liberty Mutual Group, Inc. ("Liberty Mutual"), the 401(k) Plan Administrative Committee, David H. Long, James Kelleher, Mark C. Touhey, Neeti Bhalla, Dennis J. Langwell, Melanie M. Foley, Christopher Peirce, and John Does 1–40 (collectively the

"Defendants"), for breach of fiduciary duties and prohibited transactions under ERISA.[1]

2.  The Plan's fiduciaries, including Defendants, are obligated to act for the exclusive benefit of Plan participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent.

3.  The marketplace for retirement plan services is established and competitive. Multi-billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to obtain high quality, low-cost administrative, managed account, and investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and for managed account services, and retained poorly performing investments that similarly situated fiduciaries removed from their plans.

4.  Additionally, the Defendants selected and retained imprudent investment options in the Plan. First, the Defendants retained the Sterling Mid-Cap Value Portfolio despite the fact that it had grossly underperformed its benchmark and similar mid-cap value funds for years. Second, the Defendants selected and retained the Wells Fargo Government Money Market Fund ("the Money Market Fund") as the only stable income investment option in the Plan despite the fact that stable value funds provide a similar stable income option with much higher returns in all markets.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

5. To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7. **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

8. **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed

to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

    a. The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent options in the Plan because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options and payment of excessive recordkeeping fees.

    b. The named Plaintiffs' individual accounts in the Plan were harmed because they invested in Plan investment options that would have been excluded from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

    c. The named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been

incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

d. The named Plaintiffs' individual accounts in the Plan suffered losses because each participant's account in a managed account was assessed an excessive managed account fee, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

## PARTIES

### The Liberty Mutual 401(k) Plan

9. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

10. The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

11. The Plan provides for retirement income for eligible employees of Liberty Mutual. Eligible employees include all employees except: "[l]eased [e]mployee[s]," independent contractors, employees paid through purchase orders or invoices, employees subject to collective bargaining agreements and "agency employee[s]."

12. A participant's retirement income depends upon contributions from each employee, employer matching contributions, and from the performance of the Plan's investment options, net of fees and expenses.

13. As of December 31, 2018, the Plan had over $7 billion in net assets and 50,508 participants with account balances.

14.    The Plan is among the largest 0.01% of all defined contribution plans in the United States based on plan assets. Professionals commonly refer to plans of such great size as "jumbo plans" or "mega plans." The Plan's massive size gives it enormous bargaining power to command very low investment management, managed account and recordkeeping fees for its participants.

**Plaintiffs**

15.    Yusuf Ahmed is a former Lead Sales Representative for Liberty Mutual. He resides in Sunderland, Massachusetts. He was a participant in the Plan until 2018 when he distributed his account balance from the Plan. He is nonetheless entitled to receive benefits from the Plan for the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as alleged herein.

16.    Mary Ann Stocum is a former Accounts Services Specialist for Liberty Mutual. She resides in Agawam, Massachusetts. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17.    Andrew Loring is a former Associate Product Owner for Liberty Mutual. He resides in Exeter, New Hampshire. He was a participant in the Plan until 2019 when he distributed his account balance from the Plan. He is nonetheless entitled to receive benefits from the Plan for the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as alleged herein. Andrew Loring invested his retirement savings in the Money Market Fund and the

Small-Mid Cap Equity Portfolio, including the Sterling Mid-Cap Value Portfolio, among other investments during the relevant period. Andrew Loring also used managed account services provided by Financial Engines and Strategic Advisers.

18. Mark Severn is a former Auto Physical Damage Appraiser for Liberty Mutual. He resides in Corunna, Michigan. He was a participant in the Plan until 2019 when he distributed his account balance from the Plan. He is nonetheless entitled to receive benefits from the Plan for the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as alleged herein. Mark Severn used managed account services provided by Financial Engines.

19. Edward Lief is a Senior Sales Representative for Liberty Mutual. He resides in Donald, Oregon. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan. Edward Lief invested his retirement savings in the Money Market Fund and the Small-Mid Cap Equity Portfolio, including the Sterling Mid-Cap Value Portfolio, among other investments during the relevant period. Edward Lief also used managed account services provided by Strategic Advisers.

20. Scott Diehl is a former Lead Sales Representative for Liberty Mutual. He resides in Oklahoma City, Oklahoma. He was a participant in the Plan until 2019 when he distributed his account balance from the Plan. He is nonetheless entitled to receive benefits from the Plan for the difference between the value of his account as of the time his account was distributed and what his account would have

been worth at that time had Defendants not breached their duties as alleged herein. Scott Diehl used managed account services provided by Financial Engines.

**Defendants**

21.     Liberty Mutual is a corporation organized under Massachusetts law with its principal place of business in Boston, Massachusetts. Liberty Mutual is the employer of other Plan fiduciaries. Liberty Mutual executives also appoint members of the various committees that oversee the Plan.

22.     Liberty Mutual is a fiduciary to the Plan.

23.     As alleged herein, Liberty Mutual is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan. The Liberty Mutual executives who undertook the acts alleged below did so for the benefit of and as agents for Liberty Mutual.

24.     Liberty Mutual's Chief Executive Officer appoints a Retirement Committee (hereinafter "Committee"), also known as the 401(k) Plan Administrative Committee.

25.     The Committee is named a fiduciary in the Plan document and charged with administering the Plan. The Committee is responsible for the selection, monitoring, and retention of Plan investment options. The Committee is responsible for selecting all vendors for the Plan, including the recordkeeper.

26.     David H. Long is Liberty Mutual's Chairman, President and Chief Executive Officer. Since at least 2018, Long has been a member of the Committee.

27.     James Kelleher is Liberty Mutual's Executive Vice President and Chief Legal Officer. Since at least 2018, Kelleher has been a member of the Committee.

28.     Mark C. Touhey is Liberty Mutual's Senior Vice President and Secretary. Since at least 2018, Touhey has been a member of the Committee.

29.     Neeti Bhalla is Liberty Mutual's Executive Vice President and President & Chief Investment Officer. Since at least 2018, Bhalla has been a member of the Committee.

30.     Dennis J. Langwell is Liberty Mutual's Executive Vice President and President, Global Risk Solutions. Since at least 2018, Langwell has been a member of the Committee.

31.     Melanie M. Foley is Liberty Mutual's Executive Vice President and Chief Talent & Enterprise Services Officer. Since at least 2018, Foley has been a member of the Committee.

32.     Christopher Peirce is Liberty Mutual's Executive Vice President and Chief Financial Officer. Since at least 2019, Peirce has been a member of the Committee.

33.     The Committee and its individual members are fiduciaries to the Plan because they are named fiduciaries under 29 U.S.C. 1102(a) and exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of

its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

34. Because the Liberty Mutual individuals and entities described above acted as alleged herein as agents of Liberty Mutual, all defendants are collectively referred to hereafter as "Defendants."

35. John Does 1–40 are unknown members of the Committee and other Liberty Mutual employees that exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

## ERISA'S FIDUCIARY STANDARDS

36. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)  for the exclusive purpose of
>
>> (i)  providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

37. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties, including service providers to the plan such as recordkeepers, affiliated businesses, brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

38. An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound 'to make such investments and only such investments as a prudent [person] would make of his own property. . . .'" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435. A defined contribution plan fiduciary cannot "insulate itself from liability

by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

39. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2)  if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## BACKGROUND FACTS

40.    "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades. Whereas in 1985, 89 of the Fortune 100 companies offered a traditional DB plan, in 2012, only eleven of the Fortune 100 companies offered defined benefit plans to newly hired employees. Thus, defined contribution plans have become America's retirement system.

41.    A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk. In a defined contribution plan, it is the employees' and retirees' funds at risk.

42.    Each participant in a defined contribution plan has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

43.    Most of the fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. Since the early 2000s, managed

account services make up a third category of fees assessed to participants. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

44. The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring recordkeeping service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment alternatives to which participants may direct the assets in their accounts. Those selections each have their own fees that are deducted from the returns that participants receive on their investments. The fiduciaries are responsible for hiring managed account providers and negotiating and approving those service providers' compensation.

45. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The

---

[2] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

46.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping and managed account services, rolling Plan participants' money out of the Plan and into proprietary IRAs, soliciting the purchase of wealth management services, credits cards and other retail financial products, and maximizing the number of non-plan products sold to participants. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, the level of diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets directly affects participants' retirement security.

47.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations—*e.g.*, by including proprietary funds and managed account services that will maximize the provider's fees without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money and information is at stake. Instead of simply accepting the investment funds and fees sought by these

conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

I. **Defendants breached their fiduciary duties by failing to monitor and control the Plan's recordkeeping fees and causing the Plan to pay excessive fees.**

A. **Prudent fiduciaries negotiate reasonable recordkeeping fees, monitor all sources of revenue paid to plan recordkeepers, regularly monitor plan fees and compare them to competitive market rates, and diligently negotiate fee reductions to benefit participants.**

48. Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

49. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate themselves

based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans.

50.     As one of the Plan's recordkeepers noted as early as 2008, the cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[3] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant. Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 100,000 participants can obtain much lower rates per participant than a plan with 1,000 participants.

51.     A study commissioned by the U.S. Department of Labor in 1998 demonstrates these economies of scale, finding that as the number of plan

---

[3] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, *Hewitt Assoc.*, October 2008; *see also* Mercer Investment Consulting, Inc.*, DC Fee Management—Mitigating Fiduciary Risk and Maximizing Plan Performance*, available at https://www.mercer.com/content/dam/mercer/ attachments/global/Retirement/DC%20Fee%20Management%20%20Mitigating%20Fiduciar y%20Risk%20and%20Maximizing%20Plan %20Performance.pdf(hereinafter, "Mercer Best Practices") ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

participants increases, the cost per participant decreases:[4] Per the Study, the below

expenses were based on quotations "of major 401(k) service providers."

| Number of Participants | Service Provider Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34[5] |

52.     Because recordkeeping costs are not affected by account size, prudent

fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed

dollar amount rather than as a percentage of plan assets.[6] Otherwise, as plan assets

increase, such as through participant contributions or investment gains, the

recordkeeping compensation increases without any change in the recordkeeping

services, leading to unreasonable fees.[7]

53.     For example, if a plan has 50,000 participants, a fiduciary could

negotiate a plan-level contract to pay the recordkeeper $1,500,000 per year, based

on a rate of $30 per participant fee per year. The negotiated $1,500,000

recordkeeping fee then can be assessed to participant accounts pro rata so that

smaller accounts pay a smaller portion of the fee. If the plan's assets increase

---

[4] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[5] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

[6] Mercer Best Practices at 3 ("1. Price administrative fees on a per-participant basis.").

[7] *Id.* ("Negotiate a fixed-rate recordkeeping fee, based on the number of participants with account balances in the plan, that is independent of the investment structure (referred to as an 'open investment architecture' model). This approach, unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.")

during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

54.     A fixed-dollar compensation arrangement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan; and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the rate of $30 per-participant multiplied by the number of participants would be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. If the plan in the example had $6 billion in assets, each participant would pay a direct recordkeeping fee of .025% of her account balance annual for recordkeeping ($1,500,000/$6,000,000,000 = .00025). As the plan assets increase thereafter, the *plan* is still paying the same $1,500,000 price that was negotiated at the plan level, but the fees paid by individual participants changes as they are proportionally allocated among participants based on account balance. Alternatively, the plan fiduciary could negotiate that plan participants with a particular low asset level in their accounts not pay any

recordkeeping fees or adopt a tiered structure with varying rates depending on asset level.[8]

55. Mutual funds are commonly provided as investment options in retirement plans. Mutual funds sometimes agree to pay recordkeepers a percentage of fund assets to compensate for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based fee is negotiated between the mutual fund and the recordkeeper and usually is concealed. It is designed to compensate recordkeepers for smaller plans, and thus can overcompensate a recordkeeper in large plans with large investments in the mutual funds because it is asset based. Although paying for recordkeeping with an asset-based fee is not a *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped by the plan fiduciary. If a fiduciary allows the plan recordkeeper to be compensated with an asset-based fee then the payments can become excessive based on an increase in plan assets alone. For example, the S&P 500 increased over 25% in 2019, leading to large increases in asset-based fees for services which have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

56. To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of

---

[8] Mercer Best Practices at 5–6.

compensation received by plan recordkeepers—including without limitation any revenue sharing or payments from managed account providers—and determine whether the compensation is reasonable for the services provided.

57.     Thus, if a fiduciary decides to use an asset-based fee to pay for recordkeeping, prudent fiduciaries recognize that it is critical to (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year, (2) determine all revenue sharing and other sources of compensation the recordkeeper receives from plan investment options, and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

58.     Experts in the field agree that the most certain way to determine the least compensation a plan must pay for a desired level of recordkeeping services is to put the plan's recordkeeping services out for competitive bidding on a regular basis. Prudent fiduciaries do this every three years.[9] For example, Fiduciary360's Prudent Practices for Investment Stewards, [10] which is widely accepted as the

---

[9] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable,* Defined Contribution Insights, January/February 2006, at 4 (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, Fiduciary Investment Advisors (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, January 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), available at: https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process,* InHub, May 18, 2015, available at https://d1yoaun8syyxxt.cloudfront.net/br189-76a8e37a-950c-41a0-b246-47bb6162f4a4-v2.

[10] *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary

global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[11]

59.     Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[12]

60.     The Department of Labor provides the use of an RFP to assess the reasonableness of the service provider's fees every three to five years is common practice.[13]

61.     Another large corporate 401(k) plan recordkept by Hewitt Associates (n/k/a Alight Solutions) ("Hewitt") during the relevant period is the Nike Inc,'s 401(k) Plan. Public documents show that this large plan, which had roughly 19,000 to 26,000 participant, paid the following fees for recordkeeping services.

Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary 360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees and investment committee members, investment advisors and investment managers and is widely used in the industry.

[11] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).
[12] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/
[13] "Meeting Your Fiduciary Responsibilities," *U.S. Dept. of Labor*, 2012, at pages 5–6.

| Nike, Inc. 401(k) Plan | 2016* | 2012** |
|---|---|---|
| **Per participant for recordkeeping services** | **$21** | **$21** |

*Nike, Inc. Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable.

**Nike, Inc. Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable.

62.     Another large plan, the New Albertson's Inc. 401(k) plan left Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") for Vanguard in 2016. A fee disclosure after this change states that this plan pays a fixed annual fee of $31 per participant for recordkeeping services.[14] The Form 5500 in 2016 confirms that the New Albertson's 401(k) Plan, with approximately 31,000 participants, paid approximately $31 per participant for recordkeeping services.[15]

63.     Similarly, a previously related company to New Albertson's Inc., Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants in 2016, paid approximately $29 per participant for recordkeeping services.[16]

64.     Fidelity recently stipulated in litigation that the value of the recordkeeping service it provided its own 55,000-participant plan was $21 per

---

[14] New Albertson's Inc. 401(k) Plan Fee Disclosure, *Cates v. Tr. of Columbia Univ.*, No. 16-cv-06524, Doc. 292-6 (S.D.N.Y. July 1, 2019).

[15] *See* Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.

[16] *See* Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

participant in 2014, $17 per participant in 2015 and 2016 and $14 per participant after 2017. *Moitoso v. FMR LLC*, --- F.Supp.3d ----, 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122, Doc. 138-67, at 3–4 (D. Mass.) (stipulating to the recordkeeping fees discussed above and further stipulating that "[h]ad the Plan been a third-party plan and negotiated a fixed fee for recordkeeping services at arms-length with Fidelity, it could have obtained recordkeeping services for these amounts during the period.").

### B. Contrary to the practices of prudent fiduciaries, Defendants failed to monitor and control recordkeeping fees, resulting in significant Plan losses due to excessive fees.

65.     The Plan's recordkeeper was Hewitt from at least 2009 until July 2018. In July 2018, Fidelity became the Plan's recordkeeper.

66.     Since at least January 1, 2014, the Defendants failed to analyze whether the direct and indirect compensation paid to Hewitt and Fidelity, including revenue sharing Hewitt received from Financial Engines, was reasonable compared to market rates for the same services. Defendants also failed to retain an independent third party to appropriately benchmark Hewitt and Fidelity's compensation. The Plan did not change recordkeepers from at least 2009 until July

2018. The Plan paid Hewitt a recordkeeping fee of 5 basis points ("bps") (.05%)[17], which amounted to millions of dollars each year, from at least 2013 until 2018 during a period of dramatic decreases in recordkeeping fees across the market and dramatic growth in assets in the Plan. According to the Plan's Department of Labor Form 5500s, in 2013 the Plan paid Hewitt $3,206,947 in recordkeeping fees or roughly .05% of the Plan's $6.4 billion dollars in assets.[18] The Plan's March 5, 2018 fee disclosure demonstrates that the Plan continued to pay the same 5 bps fee to Hewitt. During that same period, the assets in the Plan increased from $6.4 billion dollars to $7.1 billion dollars, thereby increasing the recordkeeping fees with no additional services. Similarly, as discussed below, the asset-based compensation that Hewitt received from Financial Engines increased. If Defendants had been monitoring and benchmarking the Plan's recordkeeping fees, they would not have allowed the Plan to pay the same asset-based fee for over five years as the assets in the Plan grew by nearly $700,000,000, allowing the recordkeeping fees to increase dramatically based upon nothing but asset growth.

67.     For the same reason, it is clear that Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services from prior to 2009 until at least 2018. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. That is particularly so because recordkeeping fees for enormous plans such as the Plan

---

[17] One basis point is equal to 1/100th of one percent (or 0.01%).
[18] Because the asset-based fees are withdrawn quarterly and based on average assets, they will not be exactly .05% of the year-end plan assets.

have been declining since 2014 and since Defendants hired Hewitt as the Plan's recordkeeper (before 2009). By failing to engage in a competitive bidding process for Plan recordkeeping fees, Defendants caused the Plan to pay excessive recordkeeping fees.

68.     Instead of obtaining a cap on the Plan's fees on a per-participant or total basis, the Defendants allowed Hewitt and Fidelity to collect excessive asset-based fees as payment for administrative services.

69.     Hewitt also received additional compensation from Plan participants via another Plan service provider—Financial Engines. Financial Engines provided managed account services to Plan participants.[19] These services utilize a computer program to select investment alternatives in which to invest participants' retirement assets. Financial Engines received a fee based on the percentage of assets in the participant's account. Financial Engines then shared 25% to 30% of that asset-based advice fee with Hewitt, even though Hewitt provided no investment advice. Because Hewitt did not provide any investment advice to receive this fee, it can only be categorized as a recordkeeping fee. Hewitt provided no recordkeeping service to Financial Engines or the Plan participants to justify this asset-based payment from Plan participants.

70.     Hewitt refers to these additional asset-based recordkeeping charges as "Data Connectivity" charges. Hewitt, via Financial Engines, charged this "Data Connectivity" charge to Plan participants since at least 2009. The payments to

---

[19] When Fidelity became recordkeeper, Strategic Advisers, LLC, a Fidelity affiliate, became the managed account service provider for the Plan.

Hewitt have grown vastly since that time, ranging from at least $62,992 in 2009 to over $400,000[20] by 2016—a greater than 635% increase. Because these "Data Connectivity" charges are assessed on a percentage of asset basis, the escalating charges bear no relationship to the true cost that a recordkeeper incurs to provide a data feed to a managed account service provider like Financial Engines, which is minimal. A data connection is a one-time expenditure, not an ongoing connectivity cost. Instead, "Data Connectivity" charges are excessive recordkeeping charges derived from Plan participants' overpayments to Financial Engines.

71.     A 2014 United States Government Accountability Office ("GAO") Study[21] reported that implementing data connectivity between a managed account provider and a recordkeeper may result in a one-time fee up to $400,000, but this cost would only be incurred if the data connection to the managed account provider is not already available on the recordkeeper's system. Therefore, because Hewitt had already set up data connectivity with Financial Engines, the Plan would not incur this cost. Additionally, as of 2014, some managed account providers had developed a process to transfer information to recordkeepers that does not require integration with the recordkeeping system, which allows the transfer of necessary data without any additional cost. *Id*. Once this data connectivity feed is established, there is near zero cost to the recordkeeper to allow electronic data connectivity to

---

[20] These numbers assumed that Financial Engines only shared 25% of its reported revenue with Hewitt and are the minimum Hewitt received because of the relationship.
[21] Available at https://www.gao.gov/assets/670/664391.pdf.

the managed account provider on an ongoing basis because it is an automated process.

72.     Financial Engines admits that recordkeeper data connectivity is a one-time charge, not a recurring one, and not one based on the amount of assets in a Plan. Financial Engines states that "[f]ollowing contract signing [with a recordkeeper], technical teams from Financial Engines and the plan provider initiate a data connection project that typically takes between four months and one year to complete. Once we have incurred this *one-time*, up-front cost to establish a relationship and connection with a plan provider, we are able to roll out our services for *any plan sponsor of that provider*." Financial Engines Form 2016 SEC Form 10-K at 10 (emphasis added).[22]

73.     The "Data Connectivity" charge collected by Hewitt is thus recordkeeping compensation. Based on publicly available Form 5500s for the Plan, this asset based recordkeeping charge represents virtually pure additional profit to Hewitt with nominal additional automated services, recordkeeping or otherwise, provided to the Plan.

74.     Even though ERISA fiduciaries are obligated to monitor service providers' compensation from all sources, the Defendants never inquired about or accounted for the payments Hewitt received from Financial Engines for recordkeeping services, much less their profits from those payments, as their fiduciary duty required them to do, in order to make sure the Plan's recordkeeping

---

[22] Available at https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm

expenses were reasonable. Instead of discharging their fiduciary duties to act prudently and in the exclusive interest of participants, Defendants served Hewitt and Fidelity's financial interests. Defendants failed to obtain competitive bids to determine whether the amounts paid to Hewitt and Fidelity for recordkeeping services were reasonable compared to market rates, and to determine whether participants would benefit from hiring a different recordkeeper with lower fees.

75.     Defendants also failed to assess whether the compensation that Hewitt obtained from Financial Engines was a prudent choice for the Plan compared to other managed account services that did not pay such disguised charges to Hewitt. The Defendants thereby allowed Hewitt to benefit itself by collecting additional unreasonable recordkeeping fees beyond the already unreasonable asset-based recordkeeping fees Hewitt collected from participants.

76.     The Defendants permitted the Plan to pay unreasonable asset-based recordkeeping fees to Hewitt and Fidelity, resulting in excessive recordkeeping fees.

77.     The Defendants were required under ERISA to determine and monitor all sources of Hewitt and Fidelity's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. Defendants' failure to properly monitor and cap the recordkeepers' compensation caused the Plan to pay excessive recordkeeping fees, as follows.

78.     Plaintiffs' consulting experts with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plan likely would have been able to obtain had the fiduciaries put the Plan's

recordkeeping services out for competitive bidding. Based on the Plan's features, the nature and type of administrative services provided by the Plan's recordkeepers, the number of Plan participants (roughly 50,000–54,000), and the recordkeeping market, at maximum the reasonable recordkeeping fee for the Plan would have been $1.26 million to $1.6 million per year (an average of $30 per-participant from 2014 to 2015 and $25 per-participant from 2016 to 2018). This is consistent with the fees of Nike, New Albertson's, Fidelity, and other large plans recordkept by Hewitt, Fidelity, Vanguard, and other prominent recordkeepers after requests for proposal during the period.

79.     Based on compensation disclosed in the Plan's Form 5500s filed with the Department of Labor, including the payments from Financial Engines to Hewitt discussed above, the Plan paid between $2 million and $4.2 million (or approximately $41 to $77 per participant) per year from 2014 to 2018, up to *300%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

80.     Even much smaller plans like Nike and New Albertson's plans paid much less for recordkeeping services. Similarly sized plans like Fidelity's plan were priced many multiples lower:

|  | Liberty Mutual | Nike | New Albertson's | Fidelity |
|---|---|---|---|---|
| Per-participant recordkeeping fee | $77 to $41 | $21 | $31 to $29 | $21 to $14 |

81.     Had the Defendants adequately monitored the Plan's recordkeeping fees, the Plan's recordkeeping fees would have been reduced to a level below $30 per participant before 2016 and $25 per-participant after 2016, fee rates that other large plans have obtained, even plans with far fewer participants such as the Nike and New Albertson's plans discussed *supra*.

82.     The Defendants' failure to monitor, control and ensure that participants were charged only reasonable fees for recordkeeping services caused the Plan to lose over $9.8 million due to unreasonable recordkeeping fees and lost investment opportunity. This is calculated by multiplying the reasonable fee per participant in the applicable year by the number of participants, subtracting the reasonable fees from the disclosed compensation in the Plan's Form 5500 and the additional compensation Hewitt received from Financial Engines from April 2014 until 2018. The damages are then brought forward yearly by the return of an S&P 500 index fund to account for lost investment opportunity.

## II.     The Defendants retained imprudent investments in the Plan.

### A. Prudent fiduciaries regularly monitor the performance and fees of investments and remove those investments with underperformance and excessive fees.

83.     Plan fiduciaries have exclusive control over the investment alternatives available in the plan. Plan participants direct and allocate the assets in their accounts to one or more of these alternatives. The investment returns are credited to participants' accounts.

84.     Each investment alternative is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad

asset class such as fixed income or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid-size, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

85.     Investment alternatives can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

86.     The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 bps. The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

87.     When selecting investments, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased

emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

88.     Academic and financial industry literature demonstrate that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-

one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

89.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively-managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 Fin. Analysts J. 7, 8 (Jan./Feb. 1991);[23] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1915 (2010) ("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

90.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55

---

[23] Available at https://www.tandfonline.com/doi/10.2469/faj.v47.n1.7.

J. Fin. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

91.　　If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

92.　　Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

93.　　Prudent fiduciaries require that a fund's time-weighted returns over a relevant period must compare favorably with the performance of the appropriate benchmark index or passively managed equivalent when deciding whether to select or retain an investment in a defined contribution plan. Experts in the industry state

that when an actively managed fund underperforms the proper benchmark for three-years trailing, then it is highly unlikely it will outperform in the future, including over the five-year trailing period. When the fund's prior rolling performance falls below the benchmark over a three-year period, the fiduciary should remove the fund from the defined contribution plan. Moreover, the path to meeting this criterion includes several other triggers (such as qualitative concerns and risk assessments) whereby the fiduciary would have initiated other analysis and communicated accordingly to the underperforming manager.

94.     The Defendants select investment alternatives into which participants' investments are directed. The Defendants also select those investment options that are removed from the Plan. These investments are designated by Defendants as designated investment alternatives offered under the Plan.

95.     The Defendants failed to adequately monitor performance for investments in the Plan.

**B. The Defendants retained the imprudent, consistently underperforming Sterling Mid-Cap Value Portfolio.**

96.     From 2013 until 2018, the Plan included the Sterling Mid-Cap Value Portfolio, which substantially underperformed its benchmark, peer group and index funds in the same asset class for multiple years prior to 2014. The Sterling Mid-Cap Value Portfolio is a separate managed account, not a publicly available mutual fund.

97.     Prior to July 2015, the underperforming Sterling Mid-Cap Value Portfolio was included as a standalone investment option in the Plan. After July

2015, the Sterling Mid-Cap Value Portfolio was included in a "Small-Mid Cap Equity Portfolio" offered as an investment option in the Plan. The Small-Mid Cap Equity Portfolio also contained the Artisan Mid Cap Growth separate account, Peregrine Small Cap Fund separate account, and Westfield Small Cap Growth separate account. The inclusion of the Sterling Mid-Cap-Value Portfolio caused the Small and Mid-Cap Equity Portfolio to earn significantly less than it would have if it included a prudent mid-cap value fund.

98. The consistent underperformance of the Sterling Mid-Cap Value Portfolio is demonstrated based on the fund's consistent underperformance against an index fund in the same asset class (the Vanguard Mid-Cap Value Index) and its benchmark (the Russell Midcap Value Index) over the three and five-year rolling periods from 2011 to 2015. .

99. As demonstrated by the charts below, the Sterling Mid-Cap Value Portfolio underperformed the Vanguard Mid-Cap Value Index on a rolling three-year period *every* year from 2011 to 2015 and rolling five-year period *every* year from 2013 to 2015.[24]

---

[24] Sterling Capital currently only provides publicly performance data dating back to 2009, so five-year rolling returns could not be calculated prior to 2013.





100.    As demonstrated by the charts below, the Sterling Mid-Cap Value Portfolio also underperformed its benchmark five year-period in every year from 2013 until 2015.



101.    Given the Sterling Mid-Cap Value Portfolio's rolling underperformance for three and five-years for the entire class period and years prior, there is no rational explanation for its retention in the Plan and selection as a component of the Small-Mid Cap Equity Portfolio.

102.    According to data from Brightscope, and verified through Form 5500s, the Plan and BB&T's (Sterling Capital's parent company) 401(k) plan were the only two defined contribution plans with over $1 billion in assets that included the Sterling Mid-Cap Value Portfolio in their plans during the class period.

103. Defendants provided the Sterling Mid-Cap Value Portfolio to advance Liberty Mutual's business interests rather than participants' interests in violation of ERISA. Liberty Mutual has extensive business relationships with Sterling's parent company, BB&T, and its subsidiaries. For example, Safeco, a Liberty Mutual wholly-owned subsidiary, underwrites BB&T Insurance Services' homeowner's insurance product.[25] BB&T has one of the largest insurance product distribution infrastructures in the world. Since the early 2000s, BB&T aggressively expanded its insurance brokerage business through organic growth and acquisitions. In 2011, BB&T ranked fourth in insurance brokerage earnings among all U.S. bank holding companies and owned more agencies than any other financial holding company in the world. Additionally, as of 2017, BB&T was the fifth largest insurance broker in the world by revenue. BB&T Insurance Services and its subsidiaries, including McGriff Seibels & Williams, Inc., sold Liberty Mutual's commercial and personal insurance products.

104. If the Plan had been invested in a prudent alternative in the mid-cap value asset class, like the Vanguard Mid-Cap Value Index Fund (VMVAX), a passively managed fund in the same asset class with lower fees and a superior performance history, the Plan would have avoided nearly $33 million in losses from April 2014 until present.

---

[25] BB&T expands online insurance offerings with homeowner's and travel insurance, available at https://bbt.mediaroom.com/news-releases?item=48716 (Aug. 1, 2011).

## C. The Defendants retained the imprudent and excessively expensive Wells Fargo Government Money Market Fund as the Plan's single capital preservation investment option despite the availability of multiple superior capital preservation options.

105.    The Money Market Fund is a money market mutual fund designed for *retail* investors, not large defined contribution plan institutional investors or other investors seeking to protect the principal of their investment while maximizing their current income.

106.    In 2012, Liberty Mutual removed a Galliard stable value fund from the Plan's lineup and replaced it with the Money Market Fund as the Plan's single capital preservation investment option.[26]

107.    Capital preservation options are conservative investments whose primary investment strategy is to preserve the investor's principal by obtaining an investment return exceeding inflation.

108.    Since 2012, Liberty Mutual retained the Money Market Fund year over year despite the fact that short-term interest rates in the United States—and relatedly, the fund's returns—have consistently been at or near zero percent.[27]

109.    Defendants provided the Money Market Fund in the Plan not based on an analysis of its merits but rather to drive significant revenue to Wells Fargo.

---

[26] Early in the relevant period, the Plan also had a small amount of funds in a short-term investment fund, the Northern Trust Short Term Investment Fund. The Northern Trust Short Term Investment Fund was not a stand-alone investment option available to participants.

[27] Vanguard, *Money Market Reform and Stable Value: Considerations for Plan Fiduciaries*, Vanguard Commentary, at 5.

110.    Following the dramatic decline in short-term interest rates,

Defendants never considered replacing the Money Market Fund or adding one or

more additional capital preservation options to the Plan, which would have

provided meaningful retirement benefits to Plan participants. Defendants never

employed appropriate methods to investigate the merits of the Money Market Fund.

111.    The Defendants failed to arrive at a reasoned decision, after evaluating

prudent alternatives that were available in the marketplace, regarding whether it

was prudent and in the Plan participants' best interests to provide this Fund as the

Plan's sole capital preservation investment.

112.    Wells Fargo partners with Liberty Mutual in a number of business

ventures.

113.    In early 2011, Wells Fargo began to commit to building out its

insurance distribution franchise, which included selling insurance products from

Liberty Mutual.

114.    Additionally, Liberty Life Assurance Company of Boston (a Liberty

Mutual subsidiary until recently) provided long-term disability insurance for Wells

Fargo employees.

115.    Liberty Mutual or a subsidiary also operated as Wells Fargo's third-

party benefits and leave administrator.

116.    Between 2011 and 2017, Wells Fargo & Co. stock was among the top

10 reported holdings of Liberty Mutual Holding Company in its quarterly and

annual reports.

117.    To help protect these and other lucrative business relationships with Wells Fargo, Defendants added and retained the Money Market Fund in the Plan, rather than a stable value fund with better returns and lower fees.

118.    The trend in the retirement plan marketplace was the opposite, with plan sponsors moving away from money market funds and into stable value funds.

119.    Notably, for much of the class period, the Money Market Fund was the only mutual fund in the Plan, while every other investment option was a lower-cost collective trust or separate pooled account.

120.    The Plan retained over $500 million in the Money Market Fund as of December 31, 2014.

>   **1.  *The Defendants knew that the Money Market Fund would not provide meaningful retirement income to Plan participants because of years of ultra-low interest rates, and the Money Market Fund failed to come close to providing a return that kept pace with inflation.***

121.    According to the Money Market Fund's prospectus, the Fund's investment returns are subject to "**[i]nterest rate risk***" which is the chance that the Fund's income will decline because of falling interest rates.[28] The Money Market Fund specifically invests in very short-term securities with a dollar-weighted average maturity of 60 days or less. *Id.* at 194. "Because the Fund invests in short-term instruments, the Fund's dividend yields are expected to be low when short-term market interest rates are low."" *Id.* at 198.

---

[28] *E.g.,* Wells Fargo Funds Trust, Government Money Market Fund, Prospectus (Form N-1A), at PDF p. 186 (May 30, 2014) (available at https://www.sec.gov/Archives/edgar/data/1081400/000108140014000101/wellsfargofundstruswrapper.htm) (emphasis in original).

122.    That money market fund yields are expected to be low when interest rates are low was common knowledge among investment professionals and plan fiduciaries at all relevant times.

123.    The Department of Labor explained the short-term nature of money market investments, which are often considered "cash equivalents" or "parking accounts" for assets to be invested in other investments:

> Money market accounts are actually mutual funds that invest in short term (typically 90 days or less), fixed income securities. As such, they are *often considered as cash equivalents...most often used as parking accounts for money waiting to be invested in other instruments*, as sweep accounts for the collection of dividends, or by very risk averse investors.[29]

124.    Money market funds are not designed to be held long-term or to provide a long-term retirement asset. Defined contribution plan participants overwhelmingly hold funds for the long term, averaging less than one trade per year.[30] Rather than being a fund to temporarily park assets, the Money Market Fund was used as a long-term holding in the Plan, which Liberty Mutual knew based on asset allocations in the Plan. This is seen from the enormous balances in the Fund year over year. As of December 31, 2013, the Money Market Fund held more than $597 million (or 9.5%) of Plan assets, and as of December 31, 2018, over $279 million. This Fund was the third-largest investment option in the Plan by

---

[29] U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, supra n.4, at §2.4.4 (emphasis added).
[30] Mitchell, *The Inattentive Participant: Portfolio Trading Behaviors in 401(k) Plans*, at 18–19.

asset size, making it clear to the Plan's fiduciaries (if they had been paying attention) that the Money Market Fund was not being used as a temporary fund.

125.    Predictably, in almost eight years, the Money Market Fund failed to even come close to providing meaningful retirement income to Plan participants. Yet Defendants have continued to provide this Fund as the Plan's only capital preservation investment option. Defendants continually failed to prudently evaluate the fact that the Fund was not returning, and could not be expected to return, an amount to even come close to the rate of inflation as a result of the microscopically low return from short-term interest rates.

126.    The following chart shows the daily three-month nominal federal interest rates as published by the United States Department of the Treasury between January 1, 2006 and December 31, 2019, graphically illustrating the lack of returns suffered by the Money Market Fund.[31] The three-month nominal federal interest rates are an appropriate proxy for investment returns of money market funds, particularly given that the average maturity of the Money Market Fund's underlying investments was 90 days or less. As the three-month nominal federal interest rate plummeted to *zero percent* in 2008 (a freefall of more than 500 bps from its peak), the strictly regulated short-term nature of the Money Market Fund's underlying investments guaranteed that Plan participants' retirement savings would be diminished net of inflation.

---

[31] United States Department of the Treasury, Resource Center, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/Historic-LongTerm-Rate-Data-Visualization.aspx.



Three-Month Treasury Constant Maturity Rate
(Jan. 1, 2006 through Dec. 31, 2019)

Source: St. Louis Federal Reserve (https://fred.stlouisfed.org/series/DGS3MO)

127.    The Money Market Fund's near-zero returns when it was added to the Plan in 2012, and subsequently retained year over year, were expected given the prevailing short-term interest rate environment and the anticipated net expense ratios reported in the Money Market Fund's prospectus for the upcoming calendar years.

128.    Following the addition of the Money Market Fund in 2012, Defendants have not employed appropriate methods to investigate the merits of the Money Market Fund or come to a reasoned decision as to why it was in Plan participants' best interest to provide this Fund as the sole capital preservation investment. In addition, the Defendants took no action when they knew and should have known, based on the massive balances in the Money Market Fund, that Plan participants were depending on the Money Market Fund as a long-term retirement vehicle. *See supra* ¶130. Defendants never communicated to Plan participants that they should

not place substantial assets in this Fund, if any, for the long term. The long-term investments of Plan participants' funds in the Money Market Fund runs directly contrary to Defendants' investment strategy when investing pension assets.

129. To protect Plan participants' retirement savings, the Defendants could have limited the amount individual participants could invest in the Money Market Fund or the percentage of their assets they could invest in the Fund, as many defined contribution plans do for some investment options, like company stock funds. The Defendants also failed to limit the aggregate amount of assets that could be invested in the Fund, which many defined contribution plans also do for some investment options.

130. These failures, among others, have detrimentally impacted Plan participants' retirement savings as the Money Market Fund's returns have remained at or near historic lows, including more than six years of returns close to zero percent.

### 2. Stable value funds are recognized capital preservation substitutes for money market funds, especially for 401(k) plans, providing enhanced returns with the guaranteed protection of principal and accrued interest.

131. As substitutes to money market funds, stable value funds are recognized capital preservation investments that are common investment vehicles in large defined contribution plans. Stable value funds are designed specifically for use in such plans as a conservative, capital preservation investment that provide a stable credit rate of interest. Stable value funds are conservatively managed, typically investing in high-quality short- to intermediate-term fixed income

investments. And, "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 Akron L. Rev. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments", and thus, "Stable Value Funds simply outperform Money Market Funds.").[32]

132.    A fundamental and critical distinguishing factor of stable value funds is that they provide a stable crediting rate of interest that provides a greater return because they invest in longer-duration securities. Unlike money market funds, stable value funds also provide an extra layer of protection—*a guaranteed interest rate over a fixed period* (usually six months)—whereas money market mutual funds provide no such guarantee.

133.    In addition, unlike money market funds, stable value funds provide a separate guarantee protecting against loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment. In contrast, participants could "lose money by investing" in the Money Market Fund, and Wells Fargo cannot guarantee that the Fund will

---

[32] Mr. Donahue's work has been specifically cited by the Seventh Circuit in *Abbott*. 725 F.3d at 806.

preserve the value of a participant's investment.[33] Stable value funds thus have been considered "a triumph of financial engineering" by offering "plan participants the *greatest yield consistent with protection of principal possible in the benefit plan environment*." Paul J. Donahue, *Stable Value Re-examined*, 54 Risks and Rewards 26, 26 (Aug. 2009) (emphasis added).[34]

134.   Because money market funds are designed for retail investors seeking a liquid, cash equivalent investment vehicle, money market fund portfolios contain large amounts of cash to ensure that they have sufficient funds available to satisfy frequent investor-directed withdrawals. In contrast, stable value funds, which are designed for defined contribution plans whose participants have longer-term investment horizons, are subject to far less frequent investor-directed withdrawals. Consequently, stable value funds can utilize longer-duration investments to provide greater returns than money market funds, combined with the same guarantee of principal and accumulated interest and liquidity. In contrast with money market funds, they also provide a guarantee of the return.

135.   There are many reputable stable value managers and wrap contract providers available in the marketplace who are capable of providing a stable value fund or similar capital preservation investment option for the Plan, including T. Rowe Price, MetLife, Galliard Capital Management, Inc., Dwight Asset Management (renamed GSAM Stable Value, LLC), and Prudential, among others.

---

[33] Wells Fargo Funds Trust, Government Money Market Fund, Prospectus (Form N-1A), at PDF p. 186 (May 30, 2014).

[34] Available at https://www.soa.org/globalassets/assets/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.

In fact, Defendants could have simply inquired with one of their longtime investment providers, Wells Fargo, State Street, and Northern Trust Company because each offered available alternatives to the Money Market Fund during the class period.

136.   Unlike money market funds whose underlying securities must satisfy the SEC's short-term maturity and liquidity guidelines, e.g., 17 C.F.R. §270.2a-7, stable value funds are managed without such limitations to short-term investment vehicles and are therefore better suited than money market funds to provide meaningful returns to their investors in any economic environment.

> Unlike money market funds, which are governed by regulations meant to allow them to meet demands for cash that can arise for any reason, unconstrained by the restrictions of a pension plan or tax considerations, stable value shapes its investment policy to recognize the liquidity restraints imposed on DC plan participants by plan design and tax law.

Donahue, Stable Value Re-examined, at 26.

137.   Focusing on long-term investment returns, stable value funds have outperformed money market funds during all economic conditions, including "during economic recessions, low interest rate environments, financial crises and during periods of increased financial stress." Sudheer Chava, *Stable Value Analysis*, at 2 (Feb. 26, 2017);[35] Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, at 24. Specifically, over the *25 years proceeding the*

---

[35] Available at http://www.prism.gatech.edu/~schava6/Industry.html.

*beginning of the class period*, from 1990 to March 31, 2016, stable value funds produced significantly more retirement income than money market funds, as recognized by Vanguard.[36]



Figure 3. Hypothetical stable value versus money market fund returns: December 31, 1990, through March 31, 2016

Notes: Chart presents data from a hypothetical stable value fund for illustrative purposes only. "Hypothetical stable value fund" represents a wrapped portfolio of 70% Barclays U.S. Intermediate Aggregate ex Baa Bond Index; 25% Barclays 1–3 year U.S. Government/Credit ex Baa Bond Index; and 5% Lipper Money Market Funds Average, gross of all fees.
Sources: Vanguard, based on data from Barclays and Thomson Reuters Lipper.

138.    As can be seen from this chart, money market funds, in nearly all interest rate environments, underperformed stable value funds throughout the *entire 22-year period. See also* Vanguard, *Stable Value Funds: Considerations for Plan Fiduciaries* (June 2019), at 3 ("Because stable value funds invest in longer-duration securities, these funds are generally expected to provide returns that exceed those of money market funds over the long term, consistent with returns of short- to intermediate-term bonds.");[37] Lee Barney, *Choosing Between a Stable Value or Money Market Fund*, PLANSPONSOR (Aug. 28, 2019) ("In the past 30 years, [Stable Value Funds] have outperformed mutual funds except for three six- to

---

[36] Vanguard, *Money Market Reform and Stable Value: Considerations for Plan Fiduciaries*, at 5.
[37] Available at https://institutional.vanguard.com/iam/pdf/ISGSTAV.pdf

12-month instances when money market funds exceeded their returns. Because of those data points, we see sponsors preferring stable value funds to money market funds. In fact, a survey by Aon found that 75% of sponsors prefer stable value funds, while 38% offer money market funds.").[38] MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors,* at 7 (2015) (stable value returns were "*more than double*" the returns of money market funds from 1988 to 2015, and, 100% of stable value providers and almost 90% of financial advisors to defined contribution plans agree that stable value funds "have outperformed money market returns over the last 25 years.").

139.    Vanguard has noted: "with interest rates near zero since the global financial crisis, the difference between stable value and money market returns has been significantly exaggerated compared to historical norms."[39]

### 3.  *Money market funds suffer from greater risk and lower returns than stable value funds.*

140.    Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Donahue, *Stable Value Re-examined*, at 28 (emphasis added). The same is not true for money market funds.

141.    During the financial crisis during 2007 and 2008, money market funds experienced severe financial difficulties. The GAO's report *401(k) Plans: Certain*

---

[38] Available at https://www.plansponsor.com/in-depth/choosing-stable-value-money-market-fund/.
[39] Vanguard, *Money Market Reform and Stable Value: Considerations for Plan Fiduciaries* (June 2016), at 5 (emphasis added), available at https://personal.vanguard.com/pdf/ISGSVMM.pdf.

*Investment Options and Practices that May Restrict Withdrawals Not Widely*

*Understood* indicates, "during 2007 and 2008, many money market funds

experienced severe financial difficulties from exposure to losses from debt

securities[.]"[40] On September 16, 2008, the oldest money market fund in the United

States with over $60 billion in assets, the Reserve Primary Fund, "stopped

satisfying redemption requests and formally instituted withdrawal restrictions on

all investors[.]" *Id.*

142.    In fact, money market funds nearly collapsed due to the financial crisis

and required corporate and government intervention to save them. Money Market

Fund Reform, 74 Fed.Reg. 32688, 32691–94 (proposed July 8, 2009). The Treasury

Department and the Federal Reserve Board of Governors had to intervene

repeatedly to stabilize and provide liquidity to the short-term markets in which

money market funds invested. *Id.* at 32692–94. The failures of money market funds

during this time "precipitated a potentially calamitous failure of the U.S. economy

and triggered massive and unprecedented government intervention." William A.

Birdthistle, *Breaking Bucks In Money Market Funds*, 2010 Wis. L. Rev. 1155, 1180

(2010).

143.    "In an effort to address concerns expressed by regulators that money

market funds may contribute to financial instability," the SEC adopted new

---

[40] Gov't Accountability Office, *401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood*, Report to the Chairman, Special Committee on Aging, U.S. Senate, at 21 (Mar. 2011), available at http://www.gao.gov/new.items/d11291.pdf.

regulations effective October 14, 2016 that allow money market funds to *prevent* investors from making withdrawals during "times of extreme volatility" or impose fees for such withdrawals.[41] The SEC designed these amendments "to address money market funds' susceptibility to heavy redemptions in times of stress, improve their ability to manage and mitigate potential contagion from such redemptions, and increase the transparency of their risks[.]"[42] The SEC specifically found the "[l]ack of investor understanding and lack of complete transparency concerning the risks posed by particular money market funds can contribute to heavy redemptions during periods of stress."[43]

144.    The inferior risk and return profile of money market funds when compared to stable value funds underscores the imprudence of providing the Money Market Fund as the sole capital preservation investment in the Plan. Recently, stable value funds have experienced lower risk (lower standard deviation) and higher returns compared to money market funds, as set forth below.[44]

---

[41] Vanguard, *Money Market Reform: What You Need to Know*, VANGUARD COMMENTARY, at 1 (Oct. 2014), available at https://personal.vanguard.com/pdf/VGMMR.pdf.
[42] Securities and Exchange Commission, *Money Market Fund Reform Final Rule*, at 1 (July 23, 2014), available at https://www.sec.gov/rules/final/2014/33-9616.pdf.
[43] *Id.* at 22.
[44] *See* Galliard Capital Management, Inc., *How Do Stable Value Fund Compare with Money Market Funds?*, available at www.galliard.com/LiteratureRetrieve.aspx?ID=66271.



### RISK/RETURN COMPARISON (4Q'06 to 4Q'16)

**Intermediate bonds**
Barclays U.S. Int Gov't/Credit

**Stable value funds**
Hueler SV Pooled Fund Universe[a]

**Money market funds**
Lipper Inst. Money Market Fund average[a]

*(Y-axis: 10 Year return, 0% to 7%; X-axis: Standard deviation (Risk), 0% to 6%)*

### Annualized risk and return comparison

| 2006 - 2016 | 10 Yr Return | 10 Yr Std. Dev. |
|---|---|---|
| Hueler Stable Value Pooled Fund Universe avg.[2] | 2.77 | 0.32 |
| Lipper Inst. Money Market Fund avg.[3] | 0.95 | 0.43 |
| Barclays U.S. Intermediate Gov't/Credit Index | 3.84 | 2.86 |

Stable value funds have historically delivered higher returns with less volatility than money market funds.

145. The superior risk/return profile of stable value funds extends well beyond the ten-year period identified above. From January 1989 through December 2009, stable value returns "exhibited both a higher mean and lower volatility than either money market or intermediate–term government/credit bond returns."[45]

---

[45] David F. Babbel and Miquel A. Herce, *Stable Value Funds: Performance to Date*, SSRN Working Paper Series, at 12 (Jan. 1, 2011), available at http://www.stern.nyu.edu/sites/default/files/assets/documents/uat_024414.pdf.

Studies demonstrate that the inclusion of a stable value fund in a portfolio both lowers risk and increases investment returns. *Id.*; Chava, Stable Value Analysis, at 9–10.

146. Between December 31, 1988 and December 31, 2014, stable value funds have similarly demonstrated less risk and much greater returns compared to money market funds, as graphically illustrated below.[46]



147. Even when compared to three other conservative investment options or "possible alternatives for a safe option" (money market, an FDIC-insured account

---

[46] Gina Mitchell, *A Guide to Stable Value Funds for Pension Plan Sponsors and Advisors,* BLOOMBERG BNA, at 2 (2015), available at http://stablevalue.org/media/misc/BenefitsArticle.pdf.

and a short-term bond fund), stable value funds still provide greater returns and lower volatility over the fifteen-year period between 2000 and 2015.[47]

148.    No hindsight is or has ever been necessary for Defendants to determine that the Money Market Fund was an imprudent capital preservation investment option for the Plan. Quantitative data over the past 30 years has conclusively determined that stable value funds exhibit superior risk/return characteristics compared to money market funds, *supra* ¶¶144–147, and have historically outperformed money market funds, *supra* ¶137. Therefore, the only reason for Defendants to include the Money Market Fund was to improve its relationship with Wells Fargo, who sold Liberty Mutual's insurance products, purchased short-term disability insurance from it and was one of its largest stock holdings.

### 4. Defendants failed to loyally and prudently discharge their duties when providing the Money Market Fund as the Plan's only capital preservation investment option.

149.    Over the preceding eight years, money market funds have failed to provide meaningful retirement income to Plan participants, particularly when compared to prudent capital preservation alternatives, such as stable value funds. The sharp decline in money market returns and their sustained low levels compared to stable value returns is graphically illustrated below. This graph emphasizes the

---

[47] Paul Donahue, *Fundamental Investment Principles of DC Option Selection Prove Optimality of Stable Value,* PENSION SECTION NEWS, Issue 88, at 16 (Feb. 2016), available at https://www.soa.org/Library/Newsletters/Pension-Section-News/2016/february/psn-2016-iss-88.pdf.

profound difference in income generated by each of these alternatives, which existed

every single day during the prior six years beginning in December 2009. [48]



Figure 3. Hypothetical stable value ve... ...net of fund returns, December 31, 1990 through March 31, 2016

Hypothetical stable value fund

Lipper Money Market Funds Average

Notes: Chart presents data from a hypothetical stable value fund for illustrative purposes only. "Hypothetical stable value fund" represents a wrapped portfolio of 70% Barclays U.S. Intermediate Aggregate ex Baa Bond Index; 25% Barclays 1–3 year U.S. Government/Credit ex Baa Bond Index; and 5% Lipper Money Market Funds Average, gross of all fees.

Sources: Vanguard, based on data from Barclays and Thomson Reuters Lipper.

150.    As an ERISA fiduciary, Liberty Mutual is required to act with the

"care, skill, prudence and diligence . . . that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like

character[.]" 29 U.S.C. §1104(a)(1)(B). The Defendants are therefore held to the

standard of a prudent expert in financial matters. *Katsaros v. Cody*, 744 F.2d 270,

279 (2d Cir. 1984).

151.    Charged with acting as a prudent financial expert familiar with such

matters, the Defendants were required to employ appropriate methods to

investigate the merits of providing the Money Market Fund as the Plan's single

capital preservation investment option, and the reasonableness of its fees. The duty

---

[48] Vanguard, *Money Market Reform and Stable Value: Considerations for Plan Fiduciaries*, at 5.

to conduct an independent and conflict free investigation of a fund option is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d at 435. This investigation necessarily includes an analysis of the fees charged and the risk and return characteristics of the Money Market Fund in comparison to prudent alternatives under the prevailing market conditions. Such analysis of an investment option or strategy is a fundamental and recognized prudent practice of fiduciaries and investment professionals in the industry. *See, e.g.*, Fiduciary 360, Prudent Practices for Investment Stewards, Practice S-2.2.1 (U.S. ed., 2008) ("2008 Investment Stewards") (requiring that the "level of risk the portfolio is exposed to is understood, and the quantitative and qualitative factors that were considered are documented"); *id.*, Practice S-3.1 ("investment option's risk-adjusted performance…should be evaluated"). This type of due diligence must be conducted because an investment strategy "can fail by being too conservative" when "keeping a portfolio in cash", which results in the "portfolio's purchasing power whither[ing] under inflation." *Id.*, Practice S-2.2.

152. The historically abysmal returns and greater risk of the Money Market Fund in comparison to a stable value fund demonstrates, at the most basic level, that the Money Market Fund was an imprudent capital preservation investment and failed to provide meaningful retirement benefits to Plan participants. *See supra* ¶¶132–148. The Defendants simply ignored the conclusive quantitative data validating the superiority of stable value funds and instead retained the Money

Market Fund to further its relationship with Wells Fargo. A fiduciary's "lack of familiarity with investments is no excuse[.]" *Katsaros*, 744 F.2d at 279.

153.    The Defendants were required to "balance the relevant factors", *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011). Had the Defendants conducted an independent, conflict-free analysis, they only could have concluded that a stable value fund or similar alternative was the prudent and loyal choice as the Plan's capital preservation investment option compared to a money market fund. No other conclusion could possibly be reached had Defendants appropriately evaluated the conclusive quantitative data and acted solely in the interest of Plan participants when providing the capital preservation investment. However, Defendants never conducted any analysis of whether the Money Market Fund was prudent or in the best interest of Plan participants as the Plan's only capital preservation investment option.

154.    Any reasonable due diligence investigation conducted by Defendants would have revealed that a stable value fund was superior to the Money Market Fund as the Plan's capital preservation investment option.

> Stable Value Fund or Money Market Fund is a universal example of Plan Sponsor exercise of option selection, because of the requirement of a liquid, low volatility fund. In the context of a DC Plan, Stable Value has an absolute superiority to Money Market, *as any reasonable due diligence investigation would make clear. The choice of a Money Market Fund instead of a Stable Value Fund meaningfully decreases Participant wealth and is a clear violation of a Plan Sponsor's duty to select options as a prudent expert.* Participants who were offered only Money Market Funds have a right to recover the difference in lost income from Plan Sponsors as damages due to a breach of fiduciary duty.

Donahue, Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market, at 25–26 (emphasis added). "Participants with [defined contribution] assets invested in stable value have every reason to be grateful to their employers for making it available." Donahue, Stable Value Re-examined, at 26.

155.    If Plan participants are only offered a single capital preservation investment option, as here, the merits of offering a stable value fund are abundantly clear.

> The reasons for stable value's growing acceptance are clear; in terms of the risk/return profile, many believe stable value funds are superior to almost any other conservative investment option, particularly money market funds. Historically, the higher yields available from stable value, compared with money market funds, have been of such magnitude as to lead to significant differences in retirement accumulations. If the choice must be made between these two conservative options, then plan sponsors would do well to remember that most anything a money market fund can do, a stable value fund can do better.

Christopher B. Tobe, *The Consultants Guide to Stable Value*. 7 J. Inv. Consulting 1, 91 (Summer 2004).

156.    Apart from placing the Money Market Fund in the Plan as the sole capital preservation investment option, no quantitative analysis exists to support the Defendants' continued retention of the Money Market Fund as the Plan's sole capital preservation investment option for the last seven years or during the six-year period from April 2014 to the present, particularly given the prevailing

interest rate environment. *See* Donahue, *Fundamental Investment Principles of DC Option Selection Prove Optimality of Stable Value*, at 16 ("There is no plausible quantitative defense for choice of a safe option other than stable value."). Moreover, between 1988 and 2016, "[s]table value funds dominate money market mutual funds and . . . the prudent choice" in a defined contribution plan "would be stable value funds and not money market mutual funds." Chava, *Stable Value Analysis*, at 47–48. Therefore, the only explanation for the addition and retention of the Money Market Fund is that the Defendants sought to improve Liberty Mutual' s relationship with Wells Fargo.

157.    In light of stable value funds' clear advantages and enhanced returns without added risk compared to other capital preservation investment options, over 80% of plan sponsors offer a stable value fund. MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5.

158.    Defendants cannot avoid their stringent fiduciary duties by merely providing the Money Market Fund "alongside a larger menu of investment options" because it has a duty to ensure that every investment option offered in a defined contribution plan is and remains prudent.

> A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options. Much as one bad apple spoils the bunch, *the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty*, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

*Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012) (emphasis added); *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011) ("It is . . . the fiduciary's responsibility . . . to screen investment alternatives and to ensure that imprudent options are not offered to plan participants.").

159. Even if the Money Market Fund had been a prudent selection in 2012, when the Defendants added it to the Plan, the Defendants had a continuing duty to monitor all investments and "remove imprudent ones." *Tibble*, 135 S.Ct. at 1829.

160. The prevailing market conditions required Defendants to regularly monitor the Money Market Fund. "Ongoing review, analysis, and monitoring" of investments is "just as important as the due diligence implemented" during the initial selection process, and must take into account "prevailing general economic conditions", the "investment strategies employed", and the "investment objectives sought", among other factors. 2008 Investment Stewards, Practice S-4.1. However, Liberty Mutual failed to engage in any due diligence demanded of plan fiduciaries.

161. Defendants' failure to investigate the merits of an alternative to the Money Market Fund for the Plan's capital preservation investment option is further indefensible because identifying such options did not require the Defendants to scour the market. For example, Vanguard, one of the largest 401(k) service providers, has offered a stable value fund since 1989. Vanguard's stable value offering has greatly outperformed the Money Market Fund over three-, five-, and ten-year periods ending December 31, 2018.



162.    For the preceding ten years between 2010 and 2019, the Money Market

Fund earned on average 50 bps—50 one hundredths of one percent—an amount

which does not even come close to keeping up with inflation, which was 17.10%, or

1,710 bps, during the period.

163.    Hueler Analytics is the industry standard for reporting returns of

stable value funds. Hueler data represents a reasonable estimate of the returns of a

typical stable value fund. The returns of the funds in the Hueler universe on

average have far exceeded the returns of the Money Market Fund year after year.[49]

---

[49] Money market investment returns were obtained from Morningstar. For the Wells Fargo
money market fund from 2014 to 2015, the "Sweep" share class (no ticker) investment
returns were used. For 2015 to 2019, the select share class (WFFXX) investment returns
were used.



164.    A comparison of Hueler Index returns over the preceding 10, 15 and 20 years reflect similar disparities between money market funds and stable value investments. *See* Karin Peterson LaBarge, *Stable Value Funds: Considerations for Plan Sponsors,* Vanguard Research, at 4 (July 2012) (the Hueler Index demonstrates that stable funds have "outperformed money market funds every year since 1990").[50]

165.    Numerous facts amply demonstrate that the Defendants failed to conduct a prudent and loyal process for determining whether to provide the Money Market Fund as the Plan's sole capital preservation investment option. Among others referenced herein, these include the following:

a.      Money market funds are specifically designed for short-term *retail* investors, not large defined contribution plans with

---

[50] Available at https://docplayer.net/36335571-Stable-value-funds-considerations-for-plan-sponsors.html.

*billions* of dollars in assets seeking to protect their principal while maximizing their current income. *See supra* ¶¶105, 134.

b. The Department of Labor's *Study of 401(k) Plan Fees and Expenses*, *supra* n.4, stated that money market funds are used as "parking accounts" waiting to be invested in other investments. Since more than $531 million was invested in the Money Market Fund as of December 31, 2014, and over $279 million as of December 31, 2018, Liberty Mutual knew or should have known that Plan participants were using the Money Market Fund for more than parking their retirement savings, and specifically as a long-term investment vehicle.

c. The United States Treasury Department reported that short-term interest rates for money market-like investments have been at historic lows for the last ten-plus years—since 2008. The Defendants therefore were on notice that the Money Market Fund would not provide meaningful long-term retirement income to Plan participants. In fact, early in this period, the Money Market Fund has consistently returned virtually *zero* percent—far less than inflation—thereby causing participants to *lose* income in real terms year after year. *See supra* ¶¶126, 137, 149, 163.

d. Even if short-term interest rates had not been historically low for the last decade, it was well established in the industry that money market funds have dramatically underperformed

stable value funds for the last 30 years during all economic conditions. *See supra* ¶¶131, 137.

e.     For many years, respected investment management literature has conclusively determined that stable value funds are superior in terms of their risk and return profile when compared to money market funds as capital preservation investment vehicles. There also is no quantitative analysis to defend the use of the Money Market Fund as the Plan's sole capital preservation investment option. *See supra* ¶¶131, 133, 137, 144–147, 154–156.

f.     The near collapse of money market funds in 2008 and the United States Treasury Department and Federal Reserve Board of Governors' intervention to stabilize them amply demonstrated the risk of money market funds. *See supra* ¶¶141–142. Moreover, in contrast to stable value funds, money market funds suffer from *high* income risk as short-term interest rates decline and cannot guarantee that a participant's principal investment will be preserved. *See supra* ¶¶121, 133.

g.     Stable value funds protect against loss of principal and accrued interest and provide an insurance company guaranteed crediting rate of interest, while money market funds do not. *See supra* ¶¶132–133.

166.    These facts amply demonstrate that the Defendants violated their stringent fiduciary responsibilities when providing the Money Market Fund as the Plan's only capital preservation investment option. A prudent fiduciary would consider using a stable value fund when providing a capital preservation investment option in a defined contribution plan. The Defendants failed to investigate the merits of providing the Money Market Fund as the Plan's capital preservation option after the dramatic decline in short-term interest rates and the sustained historically low returns of the Money Market Fund.

167.    Had the amounts invested in the Money Market Fund instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index, from April 2014 to present, Plan participants would have avoided losses of over $32.3 million in their retirement savings, as well as additional losses continuing to the present, resulting from the Money Market Fund's inclusion in the Plan.[51] Had the amounts invested in the Money Market Fund instead been invested in the Vanguard Retirement Savings Trust II, from April 2014 to present, Plan participants would have avoided losses of over $34.9 million in their retirement savings, as well as additional losses continuing to the present.

---

[51] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index or Vanguard Retirement Trust II to compensate participants who have not been reimbursed for their losses.

## III. The Plan paid excessive managed account fees beyond the "data connectivity" charges shared with the recordkeeper.

### A. The managed account services market.

168.     Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes, commonly referred to as asset allocation.

169.     Managed account providers in 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create plan participants' asset allocations. Thus, managed account service providers create a fund of a plan's funds for plan participants.

170.     Most managed account service providers, including Financial Engines, Strategic Advisers, LLC and their competitors, utilize computer programs based on modern portfolio theory and Monte Carlo simulations to create plan participants' asset allocations. Representatives can modify client-directed inputs but cannot modify outputs and recommendations from the software program. There is no quality advantage in choosing one providers' algorithm over another. Therefore, fees play a large role in the returns based on the managed account providers' services.

171.     Plan participants can allocate any percentage of their portfolio or contributions to managed account services.

172.     Managed account service providers act as fiduciaries with respect to the investment advice their software systems provide retirement plan participants.

173.     Plan fiduciaries can contract directly with a managed account provider to offer managed account services to plan participants. Alternatively, some

managed account providers use "subadvised" arrangements to offer their services through a recordkeeper. In a subadvised arrangement, the plan fiduciary retains the ultimate decision-making power on whether to offer managed accounts and the fees charged to participants.

174.	Plan fiduciaries can also contract with multiple managed account providers, only incurring a fee if Plan participants utilize the managed account services, thus increasing access to managed account providers and spurring competition without incurring additional fees.

175.	Recordkeepers, including Fidelity and Hewitt, can provide a data feed to multiple managed account service providers in order to provide managed account services to a defined contribution plan.

176.	Managed account service providers use two types of information strategies to create asset allocations for participants. The first type of strategy is referred to as customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

177.	From 2012 to 2014, managed account service providers that offered a personalized service reported that generally fewer than one-third, and sometimes fewer than 15 percent of Plan participants using the managed account service

furnish this personalized information. United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Improvements Can be Made to Better Protect Participants in Managed Accounts, June 2014, available at https://www.gao.gov/assets/670/664391.pdf (hereinafter "2014 GAO Study"). When the personalized data is used, asset allocations are nearly the same (less than a 5 percent difference), or do not change, from the customized services asset allocation decisions. *Id*. Therefore, when a plan sponsor selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying an unnecessarily higher fee.

178.    Additionally, without personalized information from plan participants, managed accounts are similar to other lower-cost asset allocation solutions. For example, target-date funds, like managed accounts, provide simple investment portfolio decisions for plan participants by providing a professionally managed asset allocation that is targeted to participant time horizons with a professional managing the asset allocation glide path. Indeed, Financial Engines cites target-date funds as potential substitutes for its management account services in its 2016 Form 10-K.

179.    Customized and personalized managed accounts often offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target-date funds,

risk-based funds and balanced funds.[52] Nonetheless, managed account participants with lower rates of return still pay substantial additional fees for managed account services compared to the fees they would incur for target-date funds, risk-based funds and balanced funds, which provide similar asset allocations.

180.    As with any investment product, prudent fiduciaries monitor whether the managed account service is providing plan participants value beyond substitute lower cost alternatives, such as target date funds. As demonstrated by the chart below, lower-cost alternatives, such as balanced funds or target date funds, are prudent alternatives, which provide the objective of participants being able to avoid having to make frequent decisions about asset allocations.

---

[52] 2014 GAO Study, citing Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Valley Forge, PA; August 2013).



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

Source: GAO representation of Vanguard returns data. | GAO-14-310

181.    Plan fiduciaries are required to act prudently in selecting and monitoring managed account providers, including monitoring managed account providers' fees in relation to the services provided and other managed account providers' fees, and monitoring the performance of the managed account providers in relation to other alternative, lower-cost products.

182.    The 2014 GAO study cites information stating that the additional fee a participant generally pays for a managed account is the primary disadvantage of managed account services.

183.    Each managed account providers' publicly filed Form ADV disclosure states that all managed account service fees are negotiable. The fees are charged through various methods: a flat fee, a capped percentage of assets under

management, a tiered assets-under-management fee, an uncapped percentage of assets under management fee, or some combination. Therefore, two participants with a similar balance but a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service. *See* 2014 GAO Study.

184.  As of 2014, managed account providers that did not charge a flat rate charged fees ranging from 8 bps to 100 bps of a participant's account balance. *See* 2014 GAO Study. At least one provider in the 2014 study offered a $20 per-participant flat fee. The 2014 table below, created by the GAO, shows the difference in fees for participants with an account balance of $10,000 or $500,000 at the start of the class period.

Table 4: Example of Variation in 401(k) Plan Managed Account Fees

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,[a] capped[b] | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangement[c] | As low as $8 | As low as $400 |
| | Variable fee, subadvised arrangement[d] | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,[e] default[f] | As high as $35 | As high as $1,100 |
| | Variable fee, tiered, opt-in[f] | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
| | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
| | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies. | GAO-14-310

185.  To demonstrate the impact of fees, the below illustration shows the impact of a participant charged an additional annual fee of 8 to 100 bps of their account balance against what the participant would pay in other investments without the managed account fee:





**Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates**

Fees paid (in dollars)

Source: GAO analysis of information from providers and published data on managed account fees and returns. | GAO-14-310

186.    The 2014 GAO Study reported that there are few independent sources of comprehensive and consistent information on managed account fees charged by providers that participants could use to compare fees across providers, and that even fee information provided in managed account providers' SEC filings was confusing or incomplete. For example, Financial Engines' 2020 Part 2A Form ADV states that retirement program clients pay 50 to 100 basis points in a tiered-assets under management structure, negotiable to less than 50 bps for plans over $20 million and that "[s]ervice and fees are generally negotiated and subject to

agreement."[53] Financial Engines' Form ADV demonstrates that managed account fees are subject to economies of scale.

187.    The 2014 GAO study also noted that managed account fees are subject to economies of scale. Participants in large plans, like the Plan, can obtain significantly lower fees than participants in small plans. *See* 2014 GAO Study at 40.

188.    Because managed account service providers provide confusing and incomplete fees in their disclosures, the duty of a plan sponsor—held to the standard of a prudent expert under ERISA—is to carefully analyze fees charged by multiple providers and diligently negotiate fees.

189.    The only way for a plan sponsor to accurately compare fees of managed account providers is to perform competitive bidding through a request for proposal.

190.    In November 2017, retirement plan investment advisor Cammack Retirement Group stated that managed account service provider contract terms and fees are a major fiduciary concern and described the importance of conducting an RFP for managed account services to show a due diligence process by interviewing vendors and "test-driving" their respective products. John Buckley, *Fiduciary Considerations When Adding and Reviewing Managed Accounts*, Cammack Retirement Group, November 2017.[54]

---

[53] Available at https://www.edelmanfinancialengines.com/media/pdf/edelman-financial-engines-adv, 17, 20-21.
[54] Available at https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts

191.    Regular negotiation of managed account fees is also necessary because managed account fees fell during the class period. For example, as of 2019, based on Form ADVs of managed account providers that did not charge a flat rate, fees were as low as 3 bps, compared to a low of 8 bps in 2014. Financial Engines 2016 Form 10-K references a "downward pressure on fees we charge for services." In 2017, Financial Engines' CEO stated that traditionally Financial Engines had a 1 bps step down per year in fees and a 2-point step down in 2018.

192.    From the early 2000s to the present, as recordkeeping fees compressed, managed account services have become more utilized in defined contribution plans, and competition for managed account services has increased.

193.    Therefore, in order to capture market conditions and negotiate current fees, prudent practice requires that Plan sponsors conduct requests for proposals for managed account services every three to five years.

**B. Defendants failed to monitor the Plan's managed account fees resulting in the participants paying excessive fees.**

194.    The Plan's fiduciaries contracted directly with its managed account service provider, Financial Engines, until July 2018.

195.    Starting in July 2018, after retaining Fidelity, Defendants allowed Fidelity to change the managed account provider to its wholly-owned affiliate Strategic Advisers, LLC not based on merit, but because Fidelity requested that Strategic Advisers, LLC provide managed account services. This enabled Fidelity to obtain lucrative revenues for its affiliate without any acquisition cost.

196.    Financial Engines and Strategic Advisers limit their investment recommendations to the investment alternatives available in the Plan.

197.    Financial Engines charged Plan participants on an uncapped percentage of assets basis. As of March 2018, Financial Engines' fees were 50 bps per year on assets up to $100,000, 45 bps between on assets between $100,001 to $250,000 and 30 bps on assets of $250,001 or more. The fee is deducted quarterly.

198.    Strategic Advisers charges Plan participants on an uncapped percentage of assets basis. Strategic Advisers' fees are 35 bps per year. The fee is deducted quarterly.

199.    Financial Engines' and Strategic Advisers' fees in the Plan were and are excessive. Financial Engines and Strategic Advisers charged Plan participants over 350% more than other managed account providers that provide a similar service. For example, Morningstar Retirement Manager charges retirement plan participants in large plans, such as the Plan, fees as low as 5 bps for managed account services. Russell Investments Capital, LLC charges managed account fees as low as 3 bps for large plans, and no greater than 28 bps for managed account services in any plan. ProManage provides managed account services for as low as 5 bps. GuidedChoice charges less than 45 bps for any size plan, and the fee is only applied to the first $100,000 in assets. The Plan's managed account fee applies to all participant assets, even those over $100,000. The Plan could have utilized these competitors to provide managed account services to Plan participants for a lower fee.

200. Financial Engines cites Morningstar, GuidedChoice and ProManage, LLC as direct competitors in a "competitive industry" in Financial Engines' 2016 Form 10-K.

201. The managed account service of each of these providers, as well as Russell, is superior or at least equal in quality to Financial Engines and Strategic Advisers' managed account services.

202. The Plan paid Financial Engines excessive fees compared to another large plan. Financial Engines charged a comparable plan lower managed account fees. Financial Engines offered variable rates based on account balances for another large plan as follows: 35 bps per year for the first $100,000 in a participant account (15 bps lower than the Plan); 30 bps per year on $100,000.01 to $250,000.00 (15 bps lower than the Plan); and 25 bps per year for any amount over $250,000.00 for similar sized plans (5 bps lower than the Plan). Even these quoted breakpoints charged to the other large plan are excessive, yet the Defendants failed to negotiate fees readily accessible to another large plan, nor did the Defendants negotiate lower fees or breakpoints on Strategic Adviser's managed account fees. In total, Plan participants paid from $1.1 million to $2.1 million per year to Financial Engines.

203. Independent of the "data connectivity" charges provided to the recordkeeper as noted above, the Defendants never investigated Financial Engines or Strategic Advisers' growing revenue or determined whether Financial Engines or Strategic Advisers' managed account fees were reasonable.

## CLASS ACTION ALLEGATIONS

204.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

205.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Liberty Mutual 401(k) Plan from April 10, 2014 through the date of judgment, excluding the Defendants.

And the following subclass:

> All participants and beneficiaries of the Liberty Mutual 401(k) Plan who utilized the Plan's managed account services from April 10, 2014 through the date of judgment, excluding the Defendants.

206.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 50,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to the Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and made omissions

alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breaches of duty.

c.     Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.     Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with any other member of the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would,

as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

207.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

208.    Plaintiffs' counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 WL 43984750, at *1 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a humongous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *3 (internal quotations omitted).

- Other courts have made similar findings:

  - "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 WL 13089487 at *2 (N.D. Ill. June 26, 2012).

  - "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015 at *2 (C.D. Ill. Oct. 15, 2013).

  - "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 WL 375432 at *2 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

  - U.S. District Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure

regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 WL 12242015, at *2 (emphasis added).

- o U.S. District Judge David Herndon of the Southern District of Illinois recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general. *Beesley*, 2014 WL 375432 at *2.

- o U.S. District Court Judge G. Patrick Murphy similarly recognized the work of Schlichter, Bogard & Denton as exceptional:

  > "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

  *Will v. General Dynamics Corp.*, No. 06-698, 2010 WL 4818174 at *3 (S.D. Ill. Nov. 22, 2010).

- Schlichter, Bogard & Denton handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 5386033 at *3 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265 at *2 (W.D. Mo. Dec. 9, 2015).

- In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "The law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

- In approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

- On January 28, 2020, Judge George L. Russell of the District of Maryland found Schlichter, Bogard & Denton "pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans" after the firm obtained a $14 million dollar settlement. *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's

broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

- The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[55] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[56] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[57] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[58] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[59] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [60] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[61] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[62] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).[63]

## COUNT I: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO UNREASONABLE RECORDKEEPING FEES

209.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

---

[55] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[56] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[57] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[58] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[59] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[60] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[61] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[62] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[63] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

210.     Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

211.     If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011).

212.     Separately, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying . . . through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

213.     The Defendants used a flawed fiduciary process for monitoring and controlling the Plan's recordkeeping fees. In contrast to the actions of hypothetical and real-world prudent fiduciaries of similar defined contribution plans, the Defendants failed to: monitor the amount of the asset-based fees received by the Plan's recordkeeper, determine if those amounts were competitive or reasonable for the services provided to the Plan, use the Plan's size to reduce fees, or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover,

the Defendants failed to solicit bids from competing providers, which is the surest way to determine the market rate for the Plan's services. Over time, as the Plan's assets grew, the asset-based payments to the Plan's recordkeeper grew, even though the services provided by the recordkeeper remained the same. This caused the recordkeeping compensation paid to the recordkeeper to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

214.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

215.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

216.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT II: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO THE STERLING MID-CAP VALUE PORTFOLIO**

217.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

218.    This Count alleges breach of fiduciary duties against Defendants.

219.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

220.     As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

221.     Defendants failed to adequately monitor and evaluate the Plan's investments. Defendants also retained for years the Sterling Mid-Cap Value Portfolio and selected it for inclusion in a white label combination fund despite its years of substantial underperformance.

222.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

223.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO THE MONEY MARKET FUND

224.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

225.    This Count alleges breach of fiduciary duties against Defendants.

226.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

227.    As the Supreme Court has confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

228.    Defendants' failure to adequately monitor the Plan's investments also led to the imprudent retention of the Wells Fargo Government Money Market Fund

as the Plan's only capital preservation option rather than a stable value fund with a better rate of return and less risk.

229.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

230.     Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

231.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV: BREACH OF FIDUCIARY DUTIES (29 U.S.C. §1104(A)(1)) AGAINST DEFENDANTS RELATED TO UNREASONABLE MANAGED ACCOUNT FEES

232.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

233.     Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

234. Defendants' process for monitoring and controlling the Plan's managed account fees was a fiduciary breach in that Defendants failed to engage in a reasoned decision making process that compared Financial Engines and Strategic Advisors' services and fees to other providers. Defendants also failed to monitor the amount of revenue received by the Plan's managed account service provider, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees. Moreover, the Defendants failed to solicit bids from competing providers. This caused the managed account compensation paid to Financial Engines and Strategic Advisers to exceed a reasonable fee for the services provided. Moreover, the undisclosed "data connectivity" scheme between Financial Engines and Hewitt was one in which Hewitt benefitted themselves at the expense of Plan participants because the more that participants paid Financial Engines the more Hewitt received in kickbacks in the form of recordkeeping compensation. This conduct was a breach of fiduciary duties.

235. The Defendants were obligated to monitor all sources of compensation for each of the Plan's service providers, including Hewitt. Defendants failed to monitor the so called "Data Connectivity" payments from Financial Engines to Hewitt to determine with the payments were a sign that both service providers' fees were excessive or were even legitimate compensation for bona fide services, or merely a quid pro quo to further the business relationship between Financial Engines and Hewitt. Defendants' failure to monitor and control these payments

caused the Plan to pay inflated managed account fees to Financial Engines and caused Hewitt's already-excessive recordkeeping compensation to become even more unreasonable. Had Defendants monitored or controlled these payments, they could have recovered the excess for the benefit of the Plan.

236. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

237. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

238. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## JURY TRIAL DEMANDED

239. Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees if the fiduciaries determine that managed account services is a prudent alternative to target date or other asset allocation funds;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

April 10, 2020                      Respectfully submitted,

/s/ Robert T. Naumes
Robert T. Naumes, BBO # 367660
Christopher Naumes, BBO # 671701
NAUMES LAW GROUP
2 Granite Ave, #425
Milton, Massachusetts 02186
617-227-8444
617-696-2437 (fax)
robert@naumeslaw.com
christopher@naumeslaw.com
*Local Counsel for Plaintiffs*

SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter (*pro hac vice* forthcoming)
Michael A. Wolff (*pro hac vice* forthcoming)
Andrew D. Schlichter (*pro hac vice*

forthcoming)
Kurt C. Struckhoff (*pro hac vice* forthcoming)
Joel Rohlf (*pro hac vice* forthcoming)
Scott T. Apking (*pro hac vice* forthcoming)
100 South Forth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
jschlichter@uselaws.com
mwolff@uselaws.com
aschlichter@uselaws.com
kstruckhoff@uselaws.com
jrohlf@uselaws.com
sapking@uselaws.com

*Lead Counsel for Plaintiffs*