UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

YUSUF AHMED, et al.,                        :

                Plaintiffs,         :       Civil Action
     v.                                                  No. 20-30056-MGM
                            :

LIBERTY MUTUAL GROUP INC., et al.,          :

                            :

                Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW**
**<u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

James R. Carroll
Michael S. Hines
Mary E. Grinman
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800

Dated:  June 3, 2020                        *Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 3

      A.     The Plan ............................................................................................. 4

      B.     Plaintiffs' Allegations ....................................................................... 5

ARGUMENT ............................................................................................................... 6

I.     COUNTS II AND III SHOULD BE
DISMISSED BECAUSE PLAINTIFFS' CONCLUSORY
ALLEGATIONS CONCERNING THE MID CAP PORTFOLIO
AND THE MONEY MARKET FUND FAIL TO STATE A CLAIM ............................ 7

      A.     Plaintiffs Allege No Facts
Permitting The Inference Of Imprudent Conduct .................................... 7

             1.     Hindsight Allegations Regarding The
Mid Cap Portfolio's Alleged Underperformance
Do Not Support An Inference Of Imprudent Conduct............................. 8

             2.     Allegations That Defendants Included A Money
Market Fund As The Plan's "Sole Capital Preservation
Investment" Option Do Not Support An Inference Of Imprudence ......... 11

      B.     Plaintiffs Do Not Plausibly Allege Any Disloyalty Related To The
Retention Of Either The Mid Cap Portfolio Or The Money Market Fund ............ 13

II.    COUNT I SHOULD BE DISMISSED BECAUSE
PLAINTIFFS' RECORDKEEPING FEE ALLEGATIONS FAIL TO STATE A
CLAIM FOR BREACH OF FIDUCIARY DUTY FOR MULTIPLE REASONS .......... 14

      A.     Plaintiffs' Bald Allegation That Recordkeeping Fees
Paid To Fidelity Were Excessive Is Insufficient to State A Claim ...................... 15

      B.     Plaintiffs' Allegations Concerning Fees Received By
The Plan's Recordkeepers From Third Parties Are Irrelevant
In Assessing Whether Defendants Satisfied Their Fiduciary Duties ................... 15

      C.     Plaintiffs' Allegations About Asset-Based Recordkeeping Fees
Are Speculative And Conclusory, And Otherwise Fail To State A Claim ............ 16

i

D.     Plaintiffs' Allegations Concerning The
Lack Of A Competitive Bidding Process Are
Conclusory And Do Not Rise To An Inference Of Imprudence ..........................18

III.    COUNT IV SHOULD BE DISMISSED
BECAUSE PLAINTIFFS' MANAGED ACCOUNT FEE
ALLEGATIONS FAIL TO STATE A CLAIM FOR THE SAME
REASONS THAT THEIR RECORDKEEPING FEE ALLEGATIONS FAIL................19

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................6

*Barchock v. CVS Health Corp.*,
   886 F.3d 43 (1st Cir. 2018)..................................................................... passim

*Barchock v. CVS Health Corp.*,
   No. CV, 16-061ML, 2017 WL 9324762 (D.R.I. Jan. 31, 2017),
   *report and recommendation adopted*, No. CV 16-061-ML, 2017 WL 1382517
   (D.R.I. Apr. 18, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018)............................8, 17

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................6

*Bunch v. W.R. Grace & Co.*,
   555 F.3d 1 (1st Cir. 2009)................................................................................2, 8

*Cunningham v. Cornell University*,
   No. 16-cv-6525 (PKC), 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017)............14

*Divane v. Northwestern University*,
   953 F.3d 980 (7th Cir. 2020) ........................................................................8, 17

*Dorman v. Charles Schwab Corp.*,
   No. 17-cv-00285-CW, 2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ..................10

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
   No. 17-CV-6685 (ALC), 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)...........12, 18

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)...........................................................................................6

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ...............................................................17, 19, 20

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) ...........................................................................11

*Laboy v. Board Trustees of Building Service*,
   513 F. App'x. 78 (2d Cir. 2013) ........................................................................8

*Leber v. Citigroup 401(K) Plan Investment Committee*,
   129 F. Supp. 3d 4 (S.D.N.Y. 2015) ...................................................................9

*Marks v. Trader Joe's Co.*,
    No. CV 19-10942 PA (JEMx), 2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ...........15, 18

*Marshall v. Northrop Grumman Corp.*,
    No. 2:16-cv-06794-AB (JCx), 2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ...........15, 18

*Meiners v. Wells Fargo*,
    898 F.3d 820 (8th Cir. 2018) .....................................................................................9, 10

*Patterson v. Stanley*,
    No. 16-cv-6568 (RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)........................ passim

*Pension Benefit Guaranty Corp. v. Morgan Stanley Investment Management Inc.*,
    712 F.3d 705 (2d Cir. 2013).........................................................................................6, 8, 9

*Pledger v. Reliance Trust Co.*,
    240 F. Supp. 3d 1314 (N.D. Ga. 2017) ....................................................................11, 12

*Taylor v. United Technologies Corp.*,
    No. 3:06-cv-1494 (WWE), 2009 WL 535779 (D. Conn. Mar. 3, 2009),
    *aff'd*, 354 F. App'x 525 (2d Cir. 2009)..............................................................................10

*White v. Chevron Corp.*,
    No. 16-CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .................... passim

*White v. Chevron Corp.*,
    No. 16-CV-0793-PJH, 2017 WL 2352137 (N.D. Cal. May 31, 2017),
    *aff'd*, 752 F. App'x 453 (9th Cir. 2018),
    *cert. denied*, 139 S. Ct. 2646 (2019) ............................................................11, 12, 13, 17

*Wilcox v. Georgetown University*,
    No. CV 18-422 (RMC), 2019 WL 132281 (D.D.C. Jan. 8, 2019)....................................19

## STATUTES & REGULATIONS                                                     PAGE(S)

29 U.S.C. § 1104.................................................................................................................5, 7

72 Fed. Reg. 60 (Oct. 24, 2007).............................................................................................12

## PRELIMINARY STATEMENT

Defendant Liberty Mutual Group Inc. ("Liberty Mutual") is a global property and casualty insurer. Liberty Mutual offers its employees the opportunity to participate in the Liberty Mutual 401(k) Plan (the "Plan"). The Plan offers participants a broad array of investment options that includes a range of investment strategies and risk profiles. Participants can choose from twenty-one investment options managed by nine third-party managers, including actively managed and passively managed investment products, as well as a diverse mix of separately managed accounts, collective trusts, and mutual funds. Liberty Mutual generously matches 50% of employee's contributions to the Plan up to 8% of their eligible compensation. The Plan also includes an auto-enrollment feature, whereby new employees are automatically enrolled to receive the benefits of the Plan. The committee that administers the Plan is comprised of Liberty Mutual's most senior executives, including the Chief Executive Officer, the Chief Legal Officer, the Chief Financial Officer, and the Chief Investment Officer. Each of them is also a participant in the Plan alongside other Liberty Mutual employees.

Plaintiffs (six former and current employees of Liberty Mutual) allege in the Complaint (ECF No. 1) that Defendants breached their fiduciary duties of loyalty and prudence under the Employee Retirement Income Security Act of 1974 ("ERISA") because they (1) retained *two* (of twenty-one) funds as investment options in the Plan that Plaintiffs, with the benefit of hindsight, say performed poorly (Counts II and III) and (2) allowed the Plan to pay recordkeeping and managed account service fees that Plaintiffs say were too high (Counts I and IV).[1] Plaintiffs' claims fail as a matter of law for a variety of independent reasons.

---

[1] "Recordkeeping is a service necessary for every defined contribution plan," and the recordkeeper typically "keeps track of the amount of each participant's investments in the various options in the plan," "provides each participant with a quarterly account statement,"

*(cont'd)*

*First*, Plaintiffs' allegations concerning just *two* of the many investment options available to participants in the Plan are insufficient as a matter of law to permit an inference of imprudent or disloyal conduct.  Plaintiffs allege that the retention of the Sterling Mid Cap Value Portfolio (the "Mid Cap Portfolio") was imprudent because it allegedly underperformed. Hindsight allegations of investment underperformance do not state a plausible claim of imprudence as a matter of law because, as the First Circuit has made clear, the test for imprudence "is one of *conduct*, and not a test of the result of performance of the investment." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (citation omitted) (emphasis in original).  Similarly insufficient are Plaintiffs' allegations that the Plan should have a included a stable value fund instead of the Wells Fargo Government Money Market Fund (the "Money Market Fund").  Numerous courts have dismissed identical claims that plans should include stable value products instead of money market products, and even the Department of Labor ("DOL"), which regulates ERISA plans, has opined that money market funds are indeed appropriate options in a retirement plan.  Lastly, Plaintiffs' allegations that Defendants retained the Mid Cap Portfolio and the Money Market Fund in order to somehow benefit business relationships are entirely speculative and insufficient to state a claim.

*Second*, Plaintiffs' allegations that the Plan paid unlawfully high fees for recordkeeping and managed account services are both conclusory and otherwise insufficient to state a claim.  For example, although Plaintiffs allege that the Plan paid unreasonable recordkeeping fees to Fidelity Investments Institutional Operations Company, Inc. ("Fidelity"),

---

"maintains a plan website or call center," and "provide[s] access to investment education materials or investment advice."  (Compl. ¶ 48.)  "Managed accounts are investment services under which providers make investment decisions for participants to allocate their retirement savings among a mix of assets classes."  (*Id.* ¶ 168.)

there is not a single allegation about the amount of fees actually charged.  Plaintiffs' allegation that Defendants failed to conduct competitive bidding processes for recordkeeping and managed account services are similarly conclusory, and moreover, fail to state a claim because competitive bidding is *not* required under ERISA.  Plaintiffs' other allegations -- that Defendants negotiated asset-based recordkeeping fees instead of flat fees and that certain other retirement plans pay less for recordkeeping and managed account services -- are also insufficient to state a claim.  As an initial matter, Plaintiffs' assertion that the fees paid to the Plan's recordkeepers are asset-based is impermissibly speculative (and in fact, incorrect).  In any event, ERISA requires neither flat administrative fees nor that plan fiduciaries select the cheapest available option.  Finally, although Plaintiffs fault Defendants for purportedly allowing the Plan's recordkeepers to receive compensation from the Plan's managed account service providers, Defendants have *no control* over the independent business arrangements between the Plan's service providers.  ERISA does not (and *cannot*) require that Plan fiduciaries regulate the myriad ways Plan service providers spend their own revenues.

## BACKGROUND

Liberty Mutual is the sponsor of the Plan.  (Compl. ¶ 22.)  A committee of Liberty Mutual employees (the "Committee") is the named fiduciary of the Plan, and is responsible for administering it.  (*Id.* ¶ 25.)  Individual defendants David H. Long (Chairman, President and Chief Executive Officer), James Kelleher (Executive Vice President and Chief Legal Officer), Mark Touhey (Senior Vice President and Secretary), Neeti Bhalla (Executive Vice President; President & Chief Investment Officer, LM Investments), Dennis Langwell (Executive Vice President and President, Global Risk Solutions), Melanie Foley (Executive Vice President and Chief Talent & Enterprise Services Officer) and Christopher Peirce (Executive Vice President and Chief Financial Officer) are alleged to be members of the Committee.  (*Id.* ¶¶ 26-33.)

A.    **The Plan**

The Plan is a "defined contribution" 401(k) plan that allows all eligible Liberty Mutual employees to contribute savings to individual participant accounts.  (Compl. ¶¶ 9, 11.) Participants' accounts are funded by employee contributions, employer contributions and an allocation of earnings from the investment fund or funds selected by the participant.  (*Id.* ¶ 12.) The Plan is participant-directed:  that is, each participant allocates the employee and employer contributions into any investment option available under the Plan.  (*See Id.* ¶ 9.)

The Plan's investment lineup is comprised of a broad array of twenty-one investment options.[2]  The Money Market Fund is a mutual fund and one of the investment options available in the Plan.  (Compl. ¶¶ 105, 108.)  The Mid Cap Portfolio was a separately managed account available to Plan participants from 2013 until 2018.  (*Id.* ¶ 96.)  The Mid Cap Portfolio was originally a standalone investment option in the Plan, but from July 2015 to 2018 the Mid Cap Portfolio was offered as part of the U.S. Small-Mid Cap Equity Portfolio investment option.  (*Id.* ¶ 97.)  The U.S. Small-Mid Cap Equity Portfolio was also comprised of three other separate accounts.  (*Id.*)

Between April 2014 and July 2018, the Plan contracted with Hewitt Associates (n/k/a Alight Solutions) ("Hewitt") to receive recordkeeping services.  Plaintiffs speculatively allege that the fee for those services was 0.05% of the Plan's assets each year (*i.e.*, 5 basis points ("bps")).  (*Id.* ¶¶ 65-66.)  In July 2018, the Plan changed its recordkeeper to Fidelity.  (*Id.* ¶ 65.) Plaintiffs do not allege the amount of recordkeeping fees charged by Fidelity.

The Plan also contracted with Financial Engines Advisors L.L.C. ("Financial Engines") until 2018 to provide managed account services to Plan participants who wanted such

---

[2]      *See* Appendix A for a complete list of investment options currently available in the Plan.

services.  (*Id.* ¶ 194.)  Participants who elected to use Financial Engines' managed account services paid between 0.3% and 0.5% of their assets under management each year.  (*Id.* ¶ 197.)  In 2018, the Plan changed its managed account provider to Strategic Advisers, LLC ("Strategic Advisers").  (*Id.* ¶ 195.)  Plaintiffs allege that Strategic Advisers charged Plan participants who chose such services 0.35% of their assets under management to participate.  (*Id.* ¶ 198.)

B. **Plaintiffs' Allegations**

Plaintiffs are five former employees and one current employee of Liberty Mutual. (Compl. ¶¶ 15-20.)  Plaintiffs Yusef Ahmed, Scott Diehl, Mark Severn and Andrew Loring are former Plan participants.  (*Id.* ¶¶ 15, 17, 18, 20.)  Plaintiffs Mary Ann Stocum and Edward Lief are alleged to be current participants in the Plan.  (*Id.* ¶¶ 16, 19.)  Plaintiffs assert claims on behalf of the Plan and a putative class comprised of "[a]ll participants [of the] . . . Plan from April 10, 2014 through the date of judgment, excluding the Defendants."  (*Id.* ¶ 205.)  Plaintiffs assert four counts:

- Count I alleges that Defendants breached their fiduciary duty of prudence under ERISA § 404, 29 U.S.C. § 1104, by allegedly failing to monitor and control the Plan's recordkeeping fees.  (*Id.* ¶¶ 209-216.)

- Count II alleges that Defendants breached their fiduciary duties of loyalty and prudence with respect to the selection, retention and monitoring of the Mid Cap Portfolio as an investment option in the Plan.  (*Id.* ¶¶ 217-223.)

- Count III alleges that Defendants breached their fiduciary duties of loyalty and prudence with respect to the selection, retention and monitoring of the Money Market Fund as an investment option in the Plan.  (*Id.* ¶¶ 224-231.)

- Count IV alleges that Defendants breached their fiduciary duty of prudence by allegedly failing to monitor and control the Plan's managed account fees.  (*Id.* ¶¶ 232-238.)

For the reasons set forth below, all Counts should be dismissed as a matter of law.

**ARGUMENT**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Although the court must take the allegations in a plaintiff's pleadings as true and make all reasonable inferences in favor of the plaintiff, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (citation omitted). Rather, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, a complaint should be dismissed where "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, 'it stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (citation omitted). This is particularly true where there is an "obvious alternative explanation" for the challenged conduct. *Id.* at 682.

In the ERISA context, a motion to dismiss is an "important mechanism for weeding out meritless [ERISA] claims," and calls for "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Indeed, "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) ("*Morgan Stanley*"). Dismissing ERISA claims that rest on mere conclusory allegations "prevent[s] settlement extortion" where "a plaintiff with a largely groundless claim [will] simply

take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence." *Id.* (citation omitted) (emphasis in original).

For the multiple independent reasons discussed below, the Complaint does not state a facially plausible claim.

## I.   COUNTS II AND III SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CONCLUSORY ALLEGATIONS CONCERNING THE MID CAP PORTFOLIO AND THE MONEY MARKET FUND FAIL TO STATE A CLAIM

Counts II and III allege that Defendants breached their fiduciary duties under ERISA § 404 by retaining two of the investment options in the Plan's lineup:  the Mid Cap Portfolio and the Money Market Fund.  (*See* Compl. ¶¶ 217-231.)  As discussed below, numerous courts have dismissed those same claims where -- as here -- they fail to plead facts that permit an inference of imprudent or disloyal conduct.

### A.   Plaintiffs Allege No Facts Permitting The Inference Of Imprudent Conduct

ERISA §404 imposes a "[p]rudent [person] standard of care" for fiduciaries of employee benefit plans.  29 U.S.C. §1104(a).  The prudent person standard charges fiduciaries with, among other things, acting (1) "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[] and . . . defraying reasonable expenses" (*i.e.*, a duty of loyalty); and (2) "with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use." (*i.e.*, duty of prudence).  *Id.* § 1104(a)(1)(A)-(B).

"[T]he test of prudence -- the Prudent [Person] Rule -- is one of *conduct*, and not a test of the result of performance of the investment."  *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (emphasis in original).  Notwithstanding that well-settled principle, Plaintiffs seek to challenge only *two* of the Plan's investment options, and even then they allege

no non-conclusory facts about Defendants' process.  Instead, Plaintiffs assert consistently

rejected theories that the retention in the Plan of an allegedly underperforming investment and a

money market fund are sufficient to infer imprudence.  As discussed below, courts have

repeatedly dismissed imprudence claims based on those same theories.  So too should this Court.

### 1. Hindsight Allegations Regarding The Mid Cap Portfolio's Alleged Underperformance Do Not Support An Inference Of Imprudent Conduct

*First*, hindsight allegations of past underperformance of *one* of the current *twenty-one* investment options do not state a plausible claim of imprudence as a matter of law.  (Compl.

¶ 101.)  It is well established under ERISA that the test for imprudence "is one of *conduct*, and

not a test of the result of performance of the investment."  *Bunch*, 555 F.3d at 7 (citation omitted)

(emphasis in original).  *See also Barchock v. CVS Health Corp.*, C.A. No. 16-061ML, 2017 WL

9324762, at *5 (D.R.I. Jan. 31, 2017) ("a claim against a fiduciary may not chart a course based

on no more than a hindsight assessment of an investment's performance"), *report and*

*recommendation adopted*, C.A. No. 16-061-ML, 2017 WL 1382517 (D.R.I. Apr. 18, 2017),

*aff'd*, 886 F.3d 43 (1st Cir. 2018).  Merely alleging that an investment had poor performance is

not sufficient to state a claim for breach of fiduciary duty -- a plaintiff "cannot rely, after the fact,

on the magnitude of the decrease in the [relevant investment's] price."  *Morgan Stanley*, 712

F.3d at 718 (citation omitted).  Indeed, numerous courts have held that allegations of

underperformance alone do not state a claim for a breach of the duty of prudence.  *See, e.g.*,

*Laboy v. Board of Trs. of Bldg. Ser.*, 513 F. App'x. 78, 80 (2d Cir. 2013) (affirming dismissal of

ERISA fiduciary duty claims and stating, "[i]t is well established that allegations of poor results

alone do not constitute allegations sufficient to state a claim for such a breach."); *Divane v. Nw.*

*Univ.*, 953 F.3d 980, 992 (7th Cir. 2020) (affirming dismissal of ERISA claims and holding "the

ultimate outcome of an investment is not proof of imprudence"); *Patterson v. Stanley*, No. 16-cv-

6568 (RJS), 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).  For example, in *Patterson*,

plaintiffs alleged that defendants breached their duty of prudence because the mid cap fund in

defendants' plan "lagged behind its alleged comparators in 2011, 2012, and 2014."  2019 WL

4934834, at * 11.  The court dismissed the claims, holding that "the mere fact that the Mid Cap

Fund did not do as well as other options does not give rise to the inference that [d]efendants'

decision to retain that investment offering was imprudent."  *Id; see also Leber v. Citigroup

401(K) Plan Inv. Comm.*, 129 F. Supp. 3d 4, 14 (S.D.N.Y. 2015) (plaintiffs' allegations of "a

history of poor . . . performance for some of the [f]unds . . . as compared to certain benchmark

indices" "d[id] not raise a plausible inference that a prudent fiduciary would have found these

[f]unds to be so plainly risky as to render the investments in them imprudent").  In any event,

Plaintiffs concede that the Mid Cap Portfolio was removed from the Plan in 2018, which

suggests that Defendants were in fact monitoring the portfolio.  (*See* Compl. ¶ 96.)

        *Second*, to the extent that Plaintiffs suggest Defendants acted imprudently by not

replacing the Mid Cap Portfolio with the Vanguard Mid-Cap Value Index, that argument also

fails.  (*See* Compl. ¶ 104.)  "[T]he duty of prudence does not compel ERISA fiduciaries to

reflexively jettison investment options in favor of the prior year's top performers."  *Patterson*,

2019 WL 4934834, at *11; *see also Meiners v. Wells Fargo*, 898 F.3d 820, 823 (8th Cir. 2018)

(affirming dismissal of ERISA breach of fiduciary duty claims and holding "[n]o authority

requires a fiduciary to pick the best performing fund").  Indeed, Plaintiffs cannot establish

imprudence by simply alleging that "better investment opportunities were available at the time of

the relevant decisions."  *Morgan Stanley*, 712 F.3d at 718.  Further, Plaintiffs compare the

performance of the Mid Cap Portfolio -- an actively-managed separate account -- against that of

a passively-managed index fund.  As Plaintiffs themselves concede, an index fund has a different

investment strategy than an actively managed fund.  (*See* Compl. ¶ 85.)  Thus, "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [Mid Cap Portfolio] w[as] an imprudent choice at the outset." *Meiners*, 898 F.3d at 823 (footnote omitted).  Moreover, multiple courts have upheld the retention of actively managed funds in a plan's lineup.  *See, e.g.*, *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2009 WL 535779, at \*10 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009) (rejecting the argument that defendants breached their fiduciary duties "by offering actively managed investment options").

   *Third*, even if Plaintiffs' underperformance allegation could support a claim -- and it cannot -- the modest underperformance alleged here does not support any inference of a fiduciary breach.  While Plaintiffs allege underperformance on a rolling three-year period from 2011 to 2015 and a rolling five-year period from 2013 to 2015 (Compl. ¶¶ 98-101), "[t]hree to five years . . . are still considered relatively short periods of underperformance."  *Dorman v. Charles Schwab Corp.*, No. 17-cv-00285-CW, 2019 WL 580785, at \*3, 6 (N.D. Cal. Feb. 8, 2019) (partially dismissing ERISA breach of fiduciary duty claims and holding that plaintiffs' allegations that a particular fund "persistently and/or materially underperformed" for three to five years did not support an inference of imprudence).  Moreover, Plaintiffs never allege underperformance of more than 3.5%.  (Compl. ¶¶ 99-100.)  In fact, Plaintiffs' own allegations show that in at least three of five years of the Mid Cap Portfolio's alleged underperformance compared to a mid-cap index fund, the Mid Cap Portfolio "underperformed" the index fund *by less than one percentage point*.  (*Id.*)  *See Patterson*, 2019 WL 4934834, at \*10 (dismissing plaintiffs' allegations premised on underperformance compared to a benchmark because a one percentage point differential over ten-year period was "insubstantial").  "[S]uch a small disparity

in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap [Portfolio] in the set of Plan offerings." *Id*.  In fact, multiple courts have recognized that a "fiduciary may -- and often does -- retain investments through a period of underperformance as a long-range investment strategy." *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("*White I*"); see *also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (dismissing ERISA fiduciary duty claims and holding that a fiduciary could prudently select "funds with long-term growth potential and . . . stay with those . . . funds even during years of lower performance").  This is especially true here, where the Plan offers twenty-one investment options, of which the Mid Cap Portfolio is just one in a larger investment strategy.

### 2. Allegations That Defendants Included A Money Market Fund As The Plan's "Sole Capital Preservation Investment" Option Do Not Support An Inference Of Imprudence

Similarly inadequate are the Complaint's allegations that Defendants included the Money Market Fund as the Plan's "sole capital preservation investment."  (*See* Compl. ¶ 144.)

*First*, numerous courts have rejected this identical theory as a matter of law.  *See e.g.*, *White I*, 2016 WL 4502808, at *7; *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2017 WL 2352137, at *11 (N.D. Cal. May 31, 2017) ("*White II*"), *aff'd*, 752 F. App'x 453 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2646 (2019); *Pledger v. Reliance Tr. Co.*, 240 F. Supp. 3d 1314, 1333 (N.D. Ga. 2017).  Nothing in ERISA requires a prudent fiduciary to select a stable value fund in lieu of a money market fund in a retirement plan.  *See, e.g.*, *White II*, 2017 2352137, at *11 ("There is no *per se* rule that a § 401(k) Plan must include a stable value fund as a capital preservation option, even if, in some years, a stable-value fund might outperform some other type of fund" (emphasis in original)).  For example, plaintiffs in *White I* alleged that "defendants' choice of a money market fund to serve as the Plan's capital conservative

11

option . . . was imprudent and . . . defendants should have provided a stable value fund as an investment option." *Id.* at *5. The court dismissed that claim, holding that "[o]ffering a money market fund as one of an array of mainstream investment options along the risk/reward spectrum more than satisfied the Plan fiduciaries' duty of prudence." *Id.* at 7. The court dismissed the same claim *again* in *White II*, holding that "[w]ithout more, the mere act of offering Plan participants a money market fund over a stable value fund as an option providing 'a high degree of safety and capital preservation' is not a fiduciary breach." 2017 WL 2352137, at *10 (citation omitted); *see also Pledger*, 240 F. Supp.3d at 1334 (dismissing claim concerning the inclusion of a money market fund over stable value funds and holding that plaintiffs' claim amounted to a challenge of "the mere selection of one fund over another, with no allegations (other than hindsight financial comparison) of why the selection was improper"); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685 (ALC), 2019 WL 4466714, at *10 (S.D.N.Y. Sept. 18, 2019) ("Without additional facts that raise an inference of imprudence by selecting the money market fund -- apart from the fact that stable value funds may provide higher return -- Plaintiffs' [complaint] fails to state a claim.").

   *Second*, Plaintiffs' assertions that "any reasonable due diligence investigation" would have led Defendants to choose a stable value fund instead of a money market fund fail to state a claim under ERISA. (*See* Compl. ¶ 153-154.) The DOL itself expressly recognizes in a preamble to a regulation concerning ERISA fiduciary responsibilities that money market funds "can . . . play an important role as a component of a diversified portfolio" and "may be prudent for some participants or beneficiaries." 72 Fed. Reg. 60,452, 60,463 (Oct. 24, 2007). *See also id.* at 60,473 n. 35 ("[M]oney market funds reasonably represent available near risk-free investment instruments."). Plaintiffs' preference for stable value funds also disregards stable

value funds' own inherent risks:  as the DOL stated in the same preamble, stable value investing

includes exposure "to the credit risk of the fund vendor" and "changes in interest rates."  *Id.* at

60,474.  Because "[n]o fiduciary selecting a plan's 'safe' option can foresee whether the risks

associated with stable value investment will come to fruition" a prudent fiduciary "may

reasonably choose to avert those risks in favor of a safer alternative."  *White II*, 2017 WL

2352137, at *10.  Like the armchair quarterback on Monday morning, Plaintiffs do no more than

second guess; such hindsight second guessing falls far short of stating a claim.

> **B.    Plaintiffs Do Not Plausibly Allege Any Disloyalty Related To The
> <u>Retention Of Either The Mid Cap Portfolio Or The Money Market Fund</u>**

Equally insufficient to state a claim are Plaintiffs' conclusory allegations that

Liberty Mutual retained the Mid Cap Portfolio to benefit Sterling's parent company, BB&T, and

retained the Money Market Fund to "drive significant revenue to Wells Fargo."  (Compl. ¶¶

103, 109).  Indeed, the Complaint includes *no facts whatsoever to support this rank speculation*;

courts readily dismiss such bare assertions of disloyalty.  For example, in *Patterson*, plaintiffs

alleged -- as Plaintiffs do here -- that fiduciaries of Morgan Stanley's 401(k) plan retained

BlackRock trusts because they were "motivated by a desire to foster a business relationship with

BlackRock."  2019 WL 4934834, at *14.  The court dismissed that conclusory allegation because

"[d]espite their attempts to imply some quid pro quo from a common business relationship,

Plaintiffs d[id] not actually allege any facts to suggest that Defendants' business relationship

with BlackRock was contingent on Defendants offering BlackRock's trusts in the Plan."  *Id.*

So too here: Plaintiffs' disloyalty theory is entirely based on the mere existence of

routine business relationships between Liberty Mutual -- a large global insurance

company -- with BB&T and Wells Fargo -- two of the largest banks in the United States.

Plaintiffs allege no facts supporting any inference of *quid pro quo*.  At bottom, all Plaintiffs

allege is that BB&T and Wells Fargo sold Liberty Mutual's insurance products, that Wells Fargo

offers Liberty Mutual insurance products to its employees, and that a Liberty Mutual subsidiary

underwrites one BB&T insurance product.  (*See* Compl. ¶¶ 103, 112-114.)  Those allegations are

grossly inadequate to state a claim that a fiduciary acted disloyally.  Indeed, Plaintiffs admit that

the Mid Cap Portfolio was removed from the Plan in 2018.  (*Id.* ¶ 96.)  At best, Plaintiffs

allegations only demonstrate that Liberty Mutual "might incidentally benefit" from its

relationships with BB&T and Wells Fargo, which "is not enough to raise an inference of

disloyalty by Defendants."  *Patterson*, 2019 WL 4934834, at *14; *see also Cunningham v.

Cornell Univ.*, No. 16-cv-6525 (PKC), 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017)

(dismissing duty of loyalty claims "[b]ecause these claims do not support an inference that

defendants' actions were *for the purpose* of providing benefits to themselves or someone else

and did not simply have that incidental effect" (emphasis in original)).  Were Plaintiffs'

disloyalty allegations sufficient to survive a motion to dismiss, it would mean that commonplace

relationships between a large insurance company and a large bank participating in the insurance

business (or indeed, a large bank simply offering insurance to its employees) could alone suggest

disloyal conduct under ERISA.  That, of course, makes no sense.

## II.  COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS' RECORDKEEPING FEE ALLEGATIONS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY FOR MULTIPLE REASONS

Count I asserts that Defendants breached their fiduciary duties by allowing the

Plan to pay allegedly unreasonable fees for recordkeeping services provided by Hewitt and

Fidelity, two of the largest and most successful recordkeepers in the country.  (*See* Compl.

¶ 213.)  Plaintiffs attempt to support this claim through a patchwork of allegations and theories,

each of which has been rejected by numerous courts under similar circumstances.  Those

recycled theories should be rejected here as well.

A.   **Plaintiffs' Bald Allegation That Recordkeeping Fees
     Paid To Fidelity Were Excessive Is Insufficient to State A Claim**

Plaintiffs claim that the Plan paid excessive recordkeeping fees to Fidelity.

(Compl. ¶¶ 68, 76.)  But what, exactly, does the Complaint allege about those fees?  The answer

is *nothing*.  There is not a single factual allegation about the amount of the fees charged.  That is

insufficient as a matter of law.  *See White I*, 2016 WL 4502808, at *15 (dismissing ERISA

breach of fiduciary duty claims based on alleged unreasonable recordkeeping fees, holding that

"[w]hile plaintiffs allege that the recordkeeping fees paid during the period February 2010 to

March 31, 2012, were excessive, there are no facts alleged showing what recordkeeping fees [the

recordkeeper] charged (so it is not clear on what basis plaintiffs are asserting that the fees were

excessive)"); *Marks v. Trader Joe's Co.*, No. CV 19-10942 PA (JEMx), 2020 WL 2504333, at

*6 (C.D. Cal. Apr. 24, 2020) (dismissing ERISA breach of fiduciary duty claims, observing that

"Plaintiffs admit they do not actually know how much the recordkeeping fees are").

B.   **Plaintiffs' Allegations Concerning Fees Received By
     The Plan's Recordkeepers From Third Parties Are Irrelevant
     In Assessing Whether Defendants Satisfied Their Fiduciary Duties**

Plaintiffs also allege that Defendants breached their fiduciary duties by allowing

the Plan's recordkeepers to "receive[] additional compensation from Plan participants via

another Plan service provider—Financial Engines" in the form of "'Data Connectivity' charges."

(Compl. ¶¶ 69-70; *see also id.* ¶¶ 56, 66, 71-75, 79, 82, 235.)  Plaintiffs fail to allege, however,

that Defendants have any control whatsoever over the fees that the Plan's recordkeepers

negotiate with third parties.  Accordingly, those allegations also fail to state a claim.

The Central District of California recently rejected identical claims.  *See Marshall

v. Northrop Grumman Corp.*, No. 2:16-cv-06794-AB (JCx), 2019 WL 4058583 (C.D. Cal. Aug.

14, 2019).  There -- just like here -- plaintiffs alleged that plan fiduciaries breached their duties

15

by causing the retirement plan "to pay excessive fees to Hewitt, its recordkeeper," based in part on "payments received by Hewitt from Financial Engines." *Id.* at *10.  The court summarily dismissed those claims as a matter of law, holding that "Plaintiffs' theory regarding Financial Engines'[] payments to Hewitt fails" because "ERISA does not require, as a matter of law, that fiduciaries leverage the type of third-party fees at issue here in order to reduce recordkeeping fees." *Id.* at *11.  The court further observed that "Data connectivity fees . . . are *not subject to fiduciary control*, the fees are not paid out of plan assets, and are for services Hewitt provides to Financial Engines out of an independent business arrangement." *Id.* (emphasis in original). Similarly here, Defendants have no "fiduciary control" over fees paid by the Plan's managed account service providers to the Plan's recordkeepers as a result of "independent business arrangement[s]" between the companies.  Accordingly, those allegations also fail to state a claim.

### C. Plaintiffs' Allegations About Asset-Based Recordkeeping Fees Are Speculative And Conclusory, And Otherwise Fail To State A Claim

Plaintiffs allege that it is impossible for a fiduciary to make a prudent choice to pay its recordkeeper as a percentage of assets invested in the Plan.  (*See* Compl. ¶ 52 ("prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of plan assets"); *see also id.* ¶¶ 50, 57.)  According to Plaintiffs, Defendants breached their fiduciary duties by allowing the Plan's recordkeepers to collect asset-based fees "[i]nstead of obtaining a cap on the Plan's fees on a per-participant or total basis." (Compl. ¶ 68.)  Plaintiffs' claims fail for at least two reasons.

*First*, Plaintiffs' allegation that Defendants allowed the Plan's recordkeeper to collect asset-based fees is unsupported and impermissibly conclusory.  *See Barchock*, 886 F.3d at 48 ("Well-pleaded facts must be 'non-conclusory' and 'non-speculative'") (citation omitted). Indeed, the Plan did not pay asset-based fees to its recordkeepers.

*Second*, Plaintiffs' preference for fixed-fee arrangements fails to state a claim in any event, and is inconsistent with the fundamental principles of ERISA which "do[] not require fiduciar[ies] to take 'any particular course of action.'" *Barchock*, 2017 WL 9324762, at *5 (citation omitted).  For example, the plaintiffs in *White I* alleged that the defendants breached ERISA fiduciary duties by paying the plan's recordkeeper via asset-based revenue sharing payments.  2016 WL 4502808, at *12.[3]  Like Plaintiffs here, the plaintiffs in *White I* "assert[ed] that because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in participants' accounts, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per plan participant, rather than as a percentage of plan assets." *Id.*; *see also* Compl. ¶¶ 50-51 (asserting nearly identical allegations).  The court dismissed those claims, holding that "plaintiffs' conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable" was "a per-se rule . . . without support." *White I*, 2016 WL 4502808, at *14; *see also White II*, 2017 WL 2352137, at *18 (holding that plaintiffs "offer[ed] no facts supporting their suggestion that the Plan's fiduciaries should have anticipated an increase in Plan assets such that asset-based fees should have been abandoned"); *Divane*, 953 F.3d at 989 (affirming dismissal of recordkeeping fee claims and holding that "plaintiffs fail to support their claim that a flat-fee structure is required by ERISA"); *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (holding that asset-based revenue sharing payments to recordkeepers "violate[] no statute or regulation" under ERISA).  Similarly here, Plaintiffs' allegations do not support an inference of imprudence.

---

[3]       Revenue sharing "is a 'common' and 'acceptable' investment industry practice" whereby a plan's recordkeeper recovers its administrative costs from plan participants by assessing asset-based fees against the various funds offered as investment options in the plan.  *See White I*, 2016 WL 4502808, at *14 (citation omitted).

### D.    Plaintiffs' Allegations Concerning The Lack Of A Competitive Bidding Process Are Conclusory And Do Not Rise To An Inference Of Imprudence

Plaintiffs allege, without citing any support, that "it is clear that Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services from prior to 2009 until at least 2018." (Compl. ¶ 67.)  Plaintiffs also identify three retirement plans that allegedly paid less for recordkeeping services than the Plan did during the putative class period. (*Id.* ¶¶ 61-63.)  Those allegations fail to state a claim, both because they are conclusory and because they are legally insufficient.

*First*, Plaintiffs' conclusory allegation that Defendants did not conduct a competitive bidding process before 2018 is insufficient to state a claim.  *See Barchock*, 886 F.3d at 48 ("Well-pleaded facts must be 'non-conclusory' and 'non-speculative'") (citation omitted); *see also Ferguson*, 2019 WL 4466714, at *8 (dismissing recordkeeping fee claims where plaintiffs failed to allege "facts suggesting DST Defendants[] did not conduct a competitive bidding process" and holding that "[t]he Court [could not] draw such a conclusion based solely on Plaintiffs' assertion that the Plan's recordkeeping fees were unreasonable").

*Second*, even crediting Plaintiffs' purely conclusory allegations, they are insufficient to create an inference of imprudent conduct.  Numerous courts have held that "the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation."  *White I*, 2016 WL 4502808, at *14; *see also Marks*, 2020 WL 2504333, at *7 (same); *Ferguson*, 2019 WL 4466714, at *8 ("ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers"); *Marshall*, 2019 WL 4058583, at *10 ("[N]othing in ERISA compels periodic competitive bidding") (citation omitted).  Moreover, Plaintiffs' arbitrary selection of three retirement plans that paid less for recordkeeping than the Plan does nothing to bolster their claims -- ERISA does not require that a fiduciary select the

18

least expensive service provider.  *See Wilcox v. Georgetown Univ.*, No. CV 18-422 (RMC), 2019 WL 132281, at *12 (D.D.C. Jan. 8, 2019) (dismissing recordkeeping fee claims, holding that "[a] fiduciary may carry out his duties in different ways but whether he violates his duty of prudence requires that 'the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining'" (citation omitted)); *Hecker*, 556 F.3d at 586 (holding "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)").

Other than Plaintiffs' conclusory assertion that Defendants did not conduct a competitive bid process until 2018, the Complaint fails to allege *a single fact* about Defendants' fiduciary process with respect to recordkeeping fees.  This is so despite the fact that "[t]he test of prudence . . . is one of *conduct*, and not a test of the result."  *Barchock*, 886 F.3d at 44-45 (emphasis in original).  Plaintiffs concede that the Plan changed recordkeepers in 2018 (Compl. ¶ 65), which supports the inference that Defendants were monitoring the Plan's recordkeeping arrangement.  *See White I*, 2016 WL 4502808, at *14 (noting "the fact that the Plan fiduciaries renegotiated the [recordkeeping] arrangement . . . plausibly suggest that defendants were monitoring recordkeeping fees to ensure that they did not become unreasonable").

III.    **COUNT IV SHOULD BE DISMISSED
        BECAUSE PLAINTIFFS' MANAGED ACCOUNT FEE
        ALLEGATIONS FAIL TO STATE A CLAIM FOR THE SAME
        REASONS THAT THEIR RECORDKEEPING FEE ALLEGATIONS FAIL**

Count IV asserts that Defendants breached their fiduciary duties by allowing the Plan to pay unreasonable fees for managed account services provided by Financial Engines and Strategic Advisers.  (*See* Compl. ¶¶ 234-35.)  The Court should dismiss those allegations for the same reasons that it should dismiss Plaintiffs' recordkeeping fee allegations.

19

Plaintiffs allege that "[c]ustomized and personalized managed accounts often offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds." (Compl. ¶ 179.) However, as with Plaintiffs' personal preference for a fixed-dollar recordkeeping arrangement, Plaintiffs' preference for alternative investment vehicles in lieu of managed accounts is equally insufficient to support an inference that the use of managed accounts was imprudent. *See supra* at 16-17. Indeed, the Plan's managed accounts were *optional* services that Plaintiffs were free to discontinue at their election.

Similarly, Plaintiffs allege that "[t]he only way for a plan sponsor to accurately compare fees of managed account providers is to perform competitive bidding through a request for proposal" which should be conducted "every three to five years" and that "Defendants failed to solicit bids from competing providers" of managed account services. (Compl. ¶¶ 189, 193, 234.) However, as with their identical allegations concerning recordkeeping fees, Plaintiffs' allegations are conclusory. *See supra* at 18. Moreover, as noted, the "allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation." *White I*, 2016 WL 4502808, at *14.

Lastly, Plaintiffs' allegations that certain retirement plans paid less for managed account services than the Plan did are insufficient to state a claim because "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *Hecker*, 556 F.3d at 586; *see supra* at 18-19. As with their recordkeeping fee allegations, Plaintiffs fail to allege any facts regarding Defendants' fiduciary *process* concerning managed account fees, and that failure sounds the death knell for their managed account fee claims.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated:  June 3, 2020                                Respectfully submitted,
        Boston, Massachusetts

                                        /s/ James R. Carroll
                                        James R. Carroll (BBO # 554426)
                                        Michael S. Hines (BBO # 653943)
                                        Mary E. Grinman (BBO # 694097)
                                        SKADDEN, ARPS, SLATE
                                          MEAGHER & FLOM LLP
                                        500 Boylston Street
                                        Boston, Massachusetts 02116
                                        (617) 573-4800
                                        james.carroll@skadden.com
                                        michael.hines@skadden.com
                                        mary.grinman@skadden.com

                                        *Counsel for Defendants*
                                        *Liberty Mutual Group Inc.,*
                                        *the 401(k) Administrative Committee,*
                                        *David H. Long, James Kelleher, Mark C.*
                                        *Touhey, Neeti Bhalla, Dennis J. Langwell,*
                                        *Melanie M. Foley, Christopher Peirce,*
                                        *and John Does 1-40*